UNITED STATE DISTICT COURT
DISTRICT OF MASACHUSETTS
WESTERN SECTION

RICHARD M. SCRUGGS

    Plaintiff

CIVIL ACTION NO.

    vs.

James O. Hall, Esquire

    Defendant

## PLAINTIFF COMPLAINT

Pursuant to Massachusetts Law, ALM GL.260§2A and ALM GL. 260§4. The Plaintiff brings a Civil Complaint against the Defendant for Legal-Professional Malpratice/Negligence/Misrepresation and Breech of Collective Bargain Agreement. Attorney Hall allowed the profile set by the CBA, the time limits and the evidence procedure to be breech. Attorney Hall allowed a corrupt arbitrator award which was not legally binding. As a lawyer, by law, he must utilize all legal possibility; Attorney Hall has not honored his fiduciary responsibility; I depend upon his superior skill and knowledge as an attorney of 17 plus years with the union. He allowed Local 455 and Northeast Utilities to butcher the whole intent of the CBA and my good faith.

The effect of his performance was the causation of my loosing the arbitration and I am asking for the damages listed below:

1. Loss of 24 year job
2. Loss of 18 years earnings at $48,000 a year x 18 equals $864,000
3. Loss of standard of living      864,000
4. Pain and suffering      864,000
5. Willful inflection of emotional distress      <u>864,000</u>

                 TOTAL $3,456,000

My accompanying brief and supporting documentation will explain how Attorney Hall had three (3) opportunities before the arbitrator award and three (3) opportunities after, but took no action.

Respectful Submitted
Pro See

*[signature]*

August 11, 2005
File today


Richard M. Scruggs
123 Mayfair Avenue
Springfield, MA 01104
*413 627-1893*

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing document of the Defendant James O. Hall Esquire, by certified mail receipt#7004 2890 0003 9299 0907, first class mail, postage prepaid at the address of, 403 Highland Avenue, Somerville, MA 02144.


August 11, 2005                          Richard M. Scruggs

*[signature]*

UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION

RICHARD M. SCRUGGS

**Plaintiff**

vs.                                                  CIVIL ACTION

James O. Hall Esquire

**Defendant**

## PLAINTIFF'S BRIEF IN SUPPORT OF HIS LEGEAL MALPRATICE/NEGLIANCE/MISRESPERTATION AGAINST ATTORNEY HALL.

Attorney Hall allowed Northeast Utilities and Local 455 to breech the CBA, by disregard the time limits, evidence placement, and procedures set by the CBA. Attorney allowed a corrupt arbitrator decision, which Attorney Hall was fully aware that her decisions was not legally binding; and to this day has done nothing to correct or address this issue. Attorney Hall has completely ignored his fiduciary responsible for me. I was fully relying on the defendants' representation of me and this counsel to keep me in formed and to prevent the CBA from being breech; but instead he allowed the CBA to be breech as well as breeching the good faith covenant.

My documentation will show, but for Attorney Hall misrepresentation in my arbitration, and his allowance of inadmissible evidence to be enter and his failure to protect the statue of limitations, was the cause of my loosing the arbitration.

I was interrogated on 4-5-02, about alleged use of a gas card on the dates of 3-18-02, and 3-22-02 I was then told by John Murray that I was either suspended or terminated; they were still putting the evidence together and to return on 4-12-02, to go over the evidence and to informed me if I was suspend or terminated, my badge and keys were collected at that time.

Upon my return on 4-15-02, I was terminated by John Murray; no evidence was produced at this time. I was told once again they were still putting the evidence together.

1

Union Rep. Clarance Kay was present at booth meetings.

Finally on or about 4-15-02, after several temps by Bill O'Rourke of trying to get the evidence, only the video tape was viewed, after viewing the video tape the union said they were going to arbitrate.

> #12 Employment Coordinator West section 47:121

The CBA states that no matter shall be submitted to an impartial arbitrator after 65 days form the date of incident. *Article 31 Grievance Procedure and Arbitration.*

> Incident date 3-18-02
> Arbitration date 8-27-02

The grievance was submitted 117 days after the incident date, 52 days past what the CBA allows.

Any changes in the CBA must be in writing 60 day prior. *Article 41 Term of Agreement.*

Only a written waiver can change the CBA, not a verbal. *Article 41 Term of Agreement.*

> #12 Employment Coordinator West sections 47:121
> Bumper Works, Inc. (1992, Arb) FMCS No. 92-09341.

Due to this breach of the CBA the arbitrator discussion is corrupt and unlawful.

> #12 Employment Coordinator West section 53:219
> Chief Freight Lines Co v. Local Union No. 866, 514 F .2d 572,89
> L.R.R.M. (BNA) 2044, 76 Lab. Cas. (CCH) 10776 (10th Cir. 1975).

> #12 Employment Coordinator West section 53:269
> 9 U.S.C.A. 10 (a); Cannon v. Consolidated Freightways Corp.,524F F.
> 2d290;.L.R.R.M. (BNA) 2996, Lab. Cas. (CCH)1126 (7th Cir 1975).

> Grisbaum v. amalgamated Meat Cutters & Tannery Worker Union,
> Local No. 73, 696 f..2d 520, 112 L.R.R.M. (BNA) 2114, 96 Lab. Cas (CCH)
> 13955 (7TH Cir 1982).

> #12Employment Coordinator West section 53:275
> 9 U.S.C.A. 10(b).

From the initial date of incident 3-18-02, should have taken no longer than 95 business day form start to finish. It took 64 extra business days to agree on an

arbitrator; CBA requires if the Company and the Union cannot agree on the arbitrator after (5) working days, the American Arbitration Association or the Federal Mediation and Conciliation service hall be requested to submit a panel of five (5) arbitrators. *Article 31 Grievance Procedure and Arbitration.*

Attorney Hall first opportunity was on August 14, 2002, when we had our first meting, and I explained then that I was terminated before I viewed any of the evidence. *Article 31 Grievance Procedure and Arbitration.*

Attorney Hall second opportunity was August 27, 2002 at the arbitration that the time limits and evidence procedure were not followed; his only objection was the video had been tamper, but he should advise the arbitrator that the evidence was not place according to the CBA *Article 31 Grievance Procedure and Arbitration* and there for is inadmissible, but Attorney Hall never addressed this issue or brought it to the arbitrator attention.

Attorney Hall third opportunity was on October 11, 2002, Attorney Hall still allowed the same breech to continue.

Attorney Hall fourth opportunity was in December of 2002, when he received the arbitrator decision, Attorney Hall was clearly aware of the breech of the CBA and that her decision was not legally binding, because it was corrupt. Susan Brown fist statement was "The undersigned Arbitrator, selected by the parties in accordance with their 2001-2004 collective bargaining agreement," was not a true statement *Article 31 Grievance Procedure and Arbitration.*

> #12 Employment Coordinator West sections 53:235
> Daiichiya-Love's Bakery, Inc. v ILWU, Local 142 (1985, DC Hawaii)  1985
> WL5864, 121 BNA LRRM 2459, 110 CCH LC 10840

> #12 Employment Coordinator West sections 53:269
> United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484  U.S. 29,
> 108 S. Ct. 364, 98 L. Ed. 2d 286, 126 L.R.R.M. (BNA) 3113, 107 Lab. Cas.
> (CCH) ¶ 10165 (1987).

> #12 Employment Coordinator West section 53:275
> Grisbaum v. Amalgamated Meat Cutters & Tannery Workers Union, Local
> No. 73, 696 F.2d 520, 112 L.R.R.M. (BNA) 2114, 96 Lab. Cas. (CCH) ¶ 13955
> (7TH Cir. 1982).

Attorney Hall fifth opportunity was in January of 2003, by phone with him and Bill O'Rourke, when I asked the booth of them for a new arbitration, and what grounds could we used for a new one.

3

Attorney Hall sixth opportunity was in August 2004, when the AFL-CIO sent a letter to Bill O'Rourke to allowed me what ever grievance procedure that was afforded to me by the CBA concerning by arbitration.

I was not aware of this breech until May of 2004. Yes I should have been aware of the breech, but it was Attorney Hall legal obligation to inform me of any breech and to correct the issue.

Northeast Utilities based their case on evidence that was not place properly before me according to the CBA, in their investigation notes they spoke about the evidence they had, but, no where in their notes, it shows them allowing me to view any of the evidence.

Susan Brown based her decision solely on evidence that was inadmissible. Attorney Hall should of informed Susan Brown that the evidence was inadmissible due to it was not propley place before me according to the CBA, that I was informed on two separated occasion they were still putting the evidence together, the first occasion I was suspended the second terminated without viewing any of their evidence.

Attorney Hall could of rescinded the decision and return me back to work; or, he should of request for a new arbitration, on the grounds that Susan Brown based her decision on evidence that was inadmissible., but, Attorney Hall never address these issue with me, or took any action on this own.

Attorney Hall's legal responsibility was to keep me informed and to prevent any and all mistakes.

Respectful Submitted
Pro See

August 11, 2005
File today

Richard M. Scruggs
123 Mayfair Avenue
Springfield, MA 01104

4

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing document of the Defendant James O. Hall Esquire, by certified mail receipt#7004 2890 0003 9299 0907, first class mail, postage prepaid at the address of 403 Highland Avenue, Somerville, MA 02144.

Rich M. Scruggs

August 11, 2005



# International Brotherhood of Electrical Workers
## Local 455

57 Observer Street
Springfield, MA 01104
Telephone (413) 733-7398
Fax (413) 788-0531
® ⟨BCIU⟩ 263-c

**WILLIAM H. O'ROURKE**
BUSINESS MANAGER/FINANCIAL SECRETARY

**BRIAN E. KENNEY**
PRESIDENT

August 5, 2002

Richard Scruggs
123 Mayfair Ave.
Springfield, MA. 01104

Dear Rich,

This is to notify you that we are scheduling a meeting to prepare your upcoming arbitration. The preparation date is August 14, Wednesday, at 10:00 AM.

Please contact me as soon as possible if you can not attend this meeting. Your arbitration hearing is scheduled for August 27, 2002. We will have the information for time and place when we meet on the 14th.

In Brotherhood,

William H. O'Rourke
Bus.Mgr./Fin.Sec.



Edwin D. Hill
International President

emiah J. O'Connor
International Secretary/Treasurer

# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

Frank J. Carroll
International Vice President
Second District

4 Armstrong Road  •  2nd Floor
Shelton, CT 06484
Phone: 203-402-0490
Fax: 203-402-0499
E-Mail: ivpd_02@ibew.org

July 20, 2004

Mr. Richard M. Scruggs
123 Mayfair Ave.
Springfield, MA 01104

Dear Brother Scruggs:

This will acknowledge receipt of your letter to me dated June 14, 2004, in which you complain about the manner in which Local Union 455 handled your grievance against Northeast Generating Service.

At the outset, I would like to clarify my role in a situation such as this. The appeals procedure in the IBEW Constitution encompasses only internal union actions taken under and pursuant to the **Constitution.** The grievance and arbitration procedure in a **collective bargaining agreement,** however, is created by the contract between the Local Union and the employer. It is important to note in this regard that it is the Local Union, and not the International, that serves as your exclusive bargaining representative for collective bargaining purposes.

The contractual grievance procedure is separate from the appeals procedure under the IBEW Constitution, and all questions about the manner in which the grievance procedure is utilized must be resolved solely under the provisions of the collective bargaining agreement. In short, the IBEW Constitution does not provide a mechanism for appealing from actions taken by a Local Union in handling grievances under a collective bargaining agreement.

For these reasons, there is no formal procedure under which I can entertain your complaint against the Local Union. Moreover, since the International has no bargaining relationship or status with your employer, I am not able to intervene on your behalf with the company. Nevertheless, in order to attempt to assist you in an informal way, I assigned International Representative Paul Ward to inquire further about the matters you have raised in your letter. With his report now before me, I would suggest that you pursue whatever additional steps may be available to you under the contractual grievance procedure.

Best wishes.

Fraternally,

Frank J. Carroll
Intl. Vice President

FJC/keq
Via U.S.P.S. Certified Return Receipt #7002 2030 0002 0747 1827
cc:    P. Ward, I.R.
       W. O'Rourke, Bus. Mgr., L.U. 455

*Connecticut  •  Maine  •  Massachusetts  •  New Hampshire  •  Rhode Island  •  Vermont*




**Northeast**
**Utilities System**

107 Selden Street, Berlin, CT 06037

Northeast Utilities Service Company
P.O. Box 270
Hartford, CT 06141-0270
(203) 665-5000

### *LEGAL DEPARTMENT*
### *FACSIMILE REQUEST*

**TO:**               **Steven Weiner, Esq.**

**DATE:**             **December 16, 2002**

**FAX NUMBER:**       **413-732-2946**

**PHONE NUMBER:**

**NUMBER OF PAGES:**  **32      (including Coversheet)**

**FROM:**             **Lisa Davenport**

**PHONE NUMBER:**     **860-665-3925    FAX NUMBER: 860-665-5504**

**SECRETARY/EXT:**    **Tammy N. Gagnon (860)665-3348**

IMPORTANT NOTICE: The documents accompanying this telecopy transmission contain information which may be confidential or privileged.
The information is intended for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be
aware that any disclosure, copying, distribution or use of the contents of this telecopied information is prohibited. If you have received this
telecopy in error, please notify us by telephone immediately so that we may arrange for the retrieval of the original documents at no cost to you.

Mr. Gilbert May
Investigator
December 6, 2002
Page 5 of 7

### B.  Respondent Had a Legitimate, Non-discriminatory Reason for Terminating the Complainant's Employment.

Complainant has alleged that, in terminating him for theft of Company resources, the Company discriminated against him on the basis of his race and color, Black. The basis of Complainant's claim is that Caucasian employees have been accused of the same type of behavior --misusing company funds-- and have not been terminated. However, Complainant is unable to come up with a single example where a similarly situated Caucasian employee was treated differently than he was. When asked specifically on the General Employment Interview Form for this Agency to provide the names and positions of persons to whom he is comparing himself, Complainant stated "Subject to discovery. I understand there should be ample evidence of other persons who are Caucasian not treated in this manner." In other words, Complainant knows of no such cases. Complainant cannot sustain a claim of discrimination on a "hunch," hoping that later discovery will uncover facts sufficient to dispute the Respondent's legitimate, non-discriminatory reason for his termination.

Title VII of the Civil Rights Act of 1964 provides, in relevant part, "It shall be an unlawful employment practice for an employer (1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race and/or color .... 42 U.S.C. § 2000e-2(a). Likewise, the Massachusetts Fair Employment Practices Act prohibits discrimination in employment on the basis of race and color. M.C.L. c.151B § 4.

Where, as here, there is no direct evidence of discrimination, this Commission must follow a three-stage order of proof. Abramiam v. Harvard, 432 Mass. 107, 116, 731 N.E.2d 1075 (2000) (citing Wynn & Wynn, P.C. v. Massachusetts Commission Against Discrimination, 431 Mass. 655, 665-66, 729 N.E.2d 1068 (2000); and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). In the first stage, the complainant has the burden to establish a *prima facie* case of discrimination by showing that "(1) he is a member of a class protected by G. L. c. 151B [and Title VII]; (2) he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's ... ." 432 Mass. at 116. Once the complainant establishes a *prima facie* case, the burden of production shifts to the employer to "'articulate a legitimate, nondiscriminatory reason' for the adverse employment action." Wynn & Wynn, P.C., 431 Mass. at 665-66. Once the employer has met its burden, the complainant must prove that the employer's reasons were not its true reasons, but were a pretext for discrimination. Id. at 666.

Mr. Gilbert May
Investigator
December 6, 2002
Page 7 of 7

Respondent thus respectfully requests that the Commission issue a finding of a lack of probable cause and dismiss Complainant's charge of discrimination.

Sincerely,

*Alicia B. Davenport*

Alicia B. Davenport

## OATH

I, Cheeneah M. Armstrong, being duly sworn, depose and state as follows:

I am employed as Director – Diversity for Northeast Utilities Service Company. The answers to the allegations of the Complaint were prepared on the basis of information, files, and records maintained by Northeast Utilities Service Company and Northeast Generation Services Company and their employees in the ordinary course of business. Therefore, to the best of my knowledge and belief, based upon information, records, and files available to me, I hereby attest to the truth of the answers to the complaint.

By: *Cheeneah M. Armstrong*
Cheeneah M Armstrong

STATE OF CONNECTICUT    )
                                 ) ss: Berlin
COUNTY OF HARTFORD       )

Subscribed and sworn before me
this 6th day of December, 2002

*Alicia B. Davenport*
Commissioner of the Superior Court/
~~Notary Public~~

~~My commission expires:~~

## \*\*\* CONFIDENTIAL \*\*\*

**DATE:**      April 22, 2002

**TO:**        William J. Nadeau

**FROM:**      Ronald S. Smith -- Internal Audit and Security
              Berlin -- X3606

**SUBJECT:  Mt. Tom Gas Card Investigation (SEC19-2002)**

## INTRODUCTION

The System Security Department (SSD) conducted an investigation into allegations that an employee working at the Mt. Tom generating was using a company Wright Express Fuel card for personal use. In early March 2002 we were contacted by John S. Murray, Station Manager -- Mt. Tom, with concerns he had regarding irregularities that he was tracking on his Wright Express fuel card reports. He had noted a pattern of purchases that appeared suspect based on the data included on the report.

## SCOPE AND METHODOLOGY

The objective of our investigation was to determine if, in fact, an employee had used the Company fuel card for his personal use. To achieve this objective, the following steps were conducted:

- Interviewed Mt. Tom Station Manager, John S. Murray.
- Reviewed information regarding card usage developed from the Wright Express fuel card transaction reports.
- Conducted surveillance.
- Interviewed suspected employee based on the results of the surveillance.
- Reviewed Corporate On-Line Time (COLT) keeping records.

## FINDINGS AND CONCLUSIONS

**Allegation:** A Mt. Tom employee, determined as a result of the investigation to be Richard M. Scruggs, was using company Wright Express fuel cards to purchase gas for his personal vehicle.

**Conclusion: SUBSTANTIATED**

Our conclusion is based on the following:

- Mr. Scruggs had access, opportunity, and knowledge of use of the Wright Express fuel card.
- SSD observed and video taped Mr. Scruggs on two occasions purchasing fuel at locations with noted suspect transactions. It was verified that at the same date, time, and location when Mr. Scruggs was observed, suspect transactions were recorded on the company Wright Express fuel card transaction reports.
- The days and times Mr. Scruggs was observed by SSD were consistent with the pattern of previously identified suspect purchases.
- Mr. Scruggs worked on all the days with noted suspect transactions.

### Investigation Detail

Mt. Tom Station manager, John Murray, had questions concerning questionable purchases he noted on his Wright Express fuel card transaction reports. The data provided on the report includes: card number, unit number, purchase location, date, time, type of fuel, amount of fuel, total cost, and vehicle odometer readings.

Data on the reports showed the following:

- Super unleaded gas was being purchased on a fuel card assigned to a diesel truck.
- Super unleaded gas was purchased on another fuel card assigned to a gas powered vehicle. Company policy only allows for the purchase of regular grade gasoline in company vehicles.
- The majority of the purchases occurred on Mondays and Fridays, generally between 1100 and 1330 hours.
- Odometer entries were not consistent with the actual mileage on the vehicles.

In our preliminary discussions with Mr. Murray we asked who would have access to the cards and the capability to leave the Mt. Tom work site without being either seen or immediately missed. Mr. Murray stated that the two men working in the storeroom, Richard M. Scruggs and Alvin Hunter would have that ability. The storeroom is located adjacent to the main gate, both men park their private vehicles next to the storeroom. In addition, they use the company vehicles to pick up materials at vendors. However, he stated that it could be anyone at the plant.

Our first surveillance was on Friday, March 15, 2002 between 1000 and 1540 hours. One agent parked on the shoulder of Route north of the Mt. Tom generating plant entrance

driveway. From this position all vehicles either entering or exiting the plant are visible. The second agent was positioned across the street from the Mobil station on Atwood Drive in Northhampton and carried a camcorder for documentation of any fuel purchases. Although based on our preliminary work our primary suspects were ~~Mr. Scruggs~~ ~~Helios~~, our investigation approach was to videotape any vehicles that left the plant and fueled up at the Atwood street facility. We would then determine whether or not a suspect transaction took place at that location and time.

We did not note any vehicles leave the plant and head north on Route 5 toward the Atwood Drive location. We concluded our surveillance at approximately 1540. On the way back to Interstate 91 a vehicle pulled out of the station heading south on Rt. 5 and pulled into Crabtree's Mobil at 1530 Northampton Street in Holyoke MA. We had noted several suspect purchases at that location in the past. ~~As a result, the employee was video~~ ~~taped~~. Subsequent to this it was determined that there had been no suspect transactions on March 15, 2002.

Our second surveillance was on Monday, March 18, 2002 between 1030 and 1155 hours. Prior to starting this day's surveillance, we were informed by ~~John Murray that Mr.~~ ~~Scruggs was driving a vehicle that was different from his usual vehicle~~. He noted that it was a late model, black, GMC Blazer type vehicle bearing Massachusetts registration number 5337CV.

Using the same procedure as previously explained, Mr. Scruggs was observed leaving the plant driveway heading northbound on Northampton Street (Rt. 5). He arrived at the Mobil station on Atwood Drive several minutes later. At approximately 1148 hours Mr. Scruggs drove to the inside island of the outer pumps and began pumping gas. At the time of this purchase the weather was overcast with a heavy snow. ~~Mr. Scruggs's~~ actions were recorded on video tape and the vehicle's registration plate, the same as given earlier by Mr. Murray, was noted on the vehicle. Upon completion of the fueling Mr. Scruggs immediately left the station and returned to the plant traveling southbound on Route 5. It was later determined that a suspect transaction took place at the same date, time and place that Mr. Scruggs was observed. The purchase transaction showed an odometer reading of 180 and a total of 14.3 gallons of unleaded plus fuel. The vehicle to which this card is assigned has a diesel engine. (note: eleven days later the mileage was checked on the vehicle to which the card is actually assigned and it showed actual mileage of 10,925 on its odometer. Card number 047600438946600931.) This transaction was consistent with other suspect transactions.

~~We planned our third surveillance for Friday March 22, 2002. We were informed on~~ ~~Thursday March 21, 2002 by Mr. Murray that Mr. Scruggs had requested a vacation day~~ ~~for Friday~~. As a result, given the results of the March 18th surveillance, SSD did not conduct surveillance on March 22.. It was later determined that a suspect transaction took place consistent with the others on Thursday March 21, 2002.

Our third surveillance was conducted on Monday, March 25, 2002 between 1030 and 1145 hours. Prior to our surveillance SSD observed Mr. Scruggs's 1988 Lincoln Mark 7

2-door, bearing Massachusetts registration 3546CV, parked in front of the storeroom at the Mt. Tom plant. Again, using the previously described surveillance procedure, Mr. Scruggs was observed leaving the plant driveway heading northbound on Route 5. At approximately 1130 hours Mr. Scruggs drove his vehicle to the outside pump at the Mobil station on Atwood Drive.

He was followed to the O'Connell Oil Company Shell station at 506 Pleasant St. (Route 5) in Northhampton. SSD parked in the "591 Food Stop" diner parking lot across the street from the Shell station and video taped Mr. Scruggs, parked in a southbound direction, as he fueled his vehicle from pump number 3 at approximately 1136 hours. Mr. Scruggs then left the Shell station and returned to the plant traveling southbound on Route 5. It was later confirmed that a suspect transaction took place at that location at the same date and time that Mr. Scruggs was observed. A review of the transaction showed an odometer reading of 1,518 was entered into the pump and a total of 13.2 gallons of super unleaded fuel was purchased. (note: four days later the mileage was checked on the vehicle to which the card is actually assigned and it showed actual mileage of 15,364 on its odometer. Card number 0476004389466600342.) The gallons and amount of purchase was consistent with what was observed at the pump after Mr. Scruggs left.

After watching Mr. Scruggs leave the Shell station SSD returned to the Mobil station in an attempt to get a reading on the pump and why he didn't purchase gas from that location. We noted on our trip to the station a note had been affixed to the pump that the automated credit card function was not working and that patrons would have to come into the station to pay for their purchase.

While at the Atwood street location SSD noted a white Ford F350 pick-up truck with a cap and NGS insignia on the door parked at the gas pumps. [illegible] use [illegible] storeroom [illegible] and he was getting those instructions from his supervisor. Mr. Murray confirmed that there were three unsuccessful attempts and one successful attempt at that location and time on that card. The unsuccessful attempts were due to invalid pin codes. From this we concluded that Mr. Holder could not have been involved.

On April 5, 2002 at 1420 hours Mr. Scruggs was interviewed by SSD regarding this investigation. Mr. Scruggs was informed by his management that the discussion could lead to disciplinary action and asked if he would like union representation. Which he did. Clarence Kaye, the union ABA, attended the interview.

Mr. Scruggs was asked a series of questions determining his knowledge of fuel and credit card use for various Company needs. He is familiar with the use of both and has used both type of cards in his position as a storeroom worker. The following were the questions asked along with Mr. Scruggs answer:

- When asked if he knew that he could buy only regular gas with a Company fuel card he answered - "yes".
- When asked if he had ever used the Company fuel card for personal use he answered - "no".
- When asked if he remembered using the Company fuel card on 3-18-2002 at the Northampton Mobil he answered - "I can't remember".
- When asked if he remembered using the Company fuel card on 3-25-2002 at the Northampton Shell he answered — "~~███████████████~~ I can't remember if I filled my personal vehicle".
- When asked if he was ever authorized by Company supervision to use the Company fuel card for his personal vehicle he answered — "no".
- When asked how he was reimbursed for business trips using his personal vehicle he answered — "I put my personal mileage on my time sheet".
- When asked if he owned a black, late model, GMC Blazer type vehicle, Mr. Scruggs was evasive and wouldn't give a definitive answer, stating only -- "it's in the family". When asked ~~how often he uses the vehicle~~ he answered — "only when it snows". (note: ~~This was the vehicle he had at the Atwood~~ ███████████ March 18, 2002 during a heavy snow.)

## RECOMMENDATION

NGS management and Human Resources should review the results of this investigation and determine the appropriate action to be taken.

## MANAGEMENT RESPONSE

c: D. R. Brown
   J. M. LaVecchia
   R. G. Lizotte
   J. S. Murray
   M. G. Morris
   S. W. McKenzie

# PROGRESSIVE CORRECTIVE
# DISCIPLINE GUIDELINES

March 25, 1999
Responsible Individual: Richard Pawloski
Human Resources Director - Labor Relations

# Contents

*page*

Introduction 1

Basic Principles 1

Expectations 3

Oral Reprimand 4

Written Reprimand 5

Suspension 6

Termination 7

References 8

Attachments
 Definitions Attachment 1
 Responsibilities Attachment 2
 Human Resources Contact List Attachment 3
 Sample Written Reprimand Attachment 4
 Listing of Offenses Attachment 5

## Introduction

NU places high importance on safety and ethical principles. These include the expectation that all employees will work and conduct themselves in accordance with applicable procedures, requirements, and the Company's Code of Conduct and Ethics.

The purpose of these guidelines is to clearly summarize the basic principles and methods of handling corrective action discipline situations. The desired outcome is the modification or elimination of inappropriate employee behavior as defined by Company policy and generally accepted professional standards.

The disciplinary processes for vendor labor and contractors are according to the applicable agency's guidelines.

The statements made in these guidelines are not intended to, nor do they, constitute any form of a contractual agreement or a guarantee of the terms or conditions by which employment will be governed.

## Basic Principles

The intent of progressive, corrective discipline is to modify an employee's behavior to prevent the recurrence of a problem. The same Company standards or rules must apply to all employees and discipline must be applied fairly and equitably as the situation warrants. **Management action may not always be identical for similar offenses, because management must take into account mitigating circumstances, aggravating circumstances, previous disciplinary action, and previous performance record.**

These guidelines reinforce the following fundamental principles:

- Appropriately apply progressive, corrective disciplinary action when employee behaviors are in conflict with Company policies, practices or procedures.

- Provide ample and clear warning. This is achieved through clearly defined disciplinary steps from oral warning to termination.

- Administer the discipline as timely as practicable. Discipline becomes less effective as more time elapses between the unacceptable behavior and the discipline.

- Consistently administer the same discipline for the same behavior for everyone — considering mitigating circumstances or aggravating factors.

- Direct the discipline toward the specific, undesirable behavior, not the individual.

- The supervisor should have another supervisor present during any meeting with the employee. In addition, employees have the right to have a union representative

Page 1

(where applicable) or co-worker present during any investigatory interview/meeting which the employee reasonably believes may result in disciplinary action. Also, employees may have a union representative (where applicable) or co-worker present during any of the disciplinary step (oral reprimand, written reprimand, suspension or termination) meetings.

## Expectations

- If an employee's behavior threatens the safety of co-workers, customers, or the public, immediate intervention into the situation will be taken.

- The sequence provided in these guidelines will be followed absent mitigating or aggravating circumstances.

- Proposed disciplinary action will be reviewed by a Human Resources representative prior to administering the discipline.

- Off-duty misconduct will be addressed on a case-by-case basis, as will illegal activities while on duty.

- From time to time, employees self-identify situations that require their supervisor to apply corrective discipline. In such cases, self-identification will be considered a mitigating factor.

- Employees have a responsibility to prevent, detect or report behavior that violates applicable procedures, requirements, and the Company's Code of Conduct and Ethics. Disciplinary action will be applied to employees who fail to prevent, detect or report offenses.

## Oral Reprimand

An oral reprimand is a verbal advisement given to an employee that identifies the problem and the corrective action the employee must take to prevent recurrence.

*Process*

1.  The supervisor will REVIEW the oral reprimand with the following personnel:
    - Next upper level of management
    - Human Resources representative (see Attachment 3)

2.  The supervisor will INVITE another supervisor to be present at oral reprimand meeting and will allow the employee to have a union representative (where applicable) or co-worker present.

3.  The supervisor will PROVIDE a clear and concise oral statement of the issue to the employee.

4.  The supervisor will ENSURE that the employee is given the opportunity to respond.

5.  The supervisor will IDENTIFY actions the employee must take to prevent recurrence.

6.  The supervisor will CONFIRM that the employee understands the reprimand and necessary actions:
    - an explanation of the offense
    - the policy rule violated
    - future expectations for improvements
    - consequences if corrective action is not achieved

7.  The supervisor will DOCUMENT in a note to the supervisor's file the fact that an oral reprimand was given that includes the action the employee must take.

## Written Reprimand

A written reprimand is a written warning given to an employee that identifies the problem and the corrective action that the employee must take to prevent recurrence. It usually follows an oral reprimand; however, it's a first step in situations of a serious or cumulative nature.

*Process*

1. In coordination with a Human Resources representative (see Attachment 3), the supervisor will DRAFT a written reprimand to include the following:
   - a statement of the problem/explanation of the offense
   - policy or rule violated
   - future expectations for improvement
   - consequences if corrective action is not achieved

2. The supervisor will REVIEW the written reprimand with the following personnel:
   - Next upper level of management
   - Human Resources representative (see Attachment 3)

3. The supervisor will PERFORM the following:
   - PRESENT approved written document to the employee
   - ENSURE employee knows the reasons for the reprimand and the corrective actions necessary to prevent recurrence.
   - DOCUMENT the discussion and the corrective actions with the employee.

4. The supervisor will PROVIDE copies of the written reprimand to the following personnel:
   - the employee (original)
   - appropriate Human Resources director (see Attachment 3) (copy)
   - Personnel File (Berlin BMW1) (copy)
   - Personnel File (Plaza) for PSNH employees only
   - Labor Relations (Berlin BMW 1) (copy)
   - Labor Relations (Plaza) for PSNH employees only
   - Union Representative for bargaining unit employees
   - other appropriate management

## Suspension

Suspension is time off without pay* for a specified period of time. It usually follows a written reprimand; however, it may be used as a first step in situations of a serious or cumulative nature.

The duration of a suspension is dependent on the seriousness of the offense, whether it is a repeat issue, or one of several unrelated but cumulative problems.

*Process*

1.  In accordance with a Human Resources representative (see Attachment 3), the supervisor will REVIEW the recommended suspension and duration with the chain of management, (typically two levels above the disciplined individual), and NOTIFY the functional officer of the following:
    - statement of the problem/explanation of the offense
    - policy or rule violated
    - future expectations for improvement
    - consequences if corrective action is not achieved

2.  The supervisor will ENSURE that the employee knows the following
    - reasons for suspension
    - corrective actions necessary to prevent recurrence
    - consequences if corrective action is not achieved

3.  The supervisor will PROVIDE copies of the suspension notice to the following personnel:
    - the employee (original)
    - appropriate Human Resources director (see Attachment 3) (copy)
    - Personnel File (Berlin BMW1) (copy)
    - Personnel File (Plaza) for PSNH employees only
    - Labor Relations (Berlin BMW 1) (copy)
    - Labor Relations (Plaza) for PSNH employees only
    - Union Representative for bargaining unit employees
    - other appropriate management

*A suspension may be given with pay based on mitigating factors as determined by the company.

## Termination

Termination is the discharge of a person from employment with the Company. It is the final action to be taken by management, which usually follows suspension; however, termination may be the first action in certain circumstances of a serious nature.

*Process*

1. In coordination with a Human Resources representative (see Attachment 3), the supervisor will REVIEW the recommended termination with the chain of management, (typically two levels above the disciplined individual), and NOTIFY the functional officer of the following:
   - statement of the problem
   - policy or rule violated

2. The supervisor will PROVIDE approved written documentation to the employee which includes the following:
   - an explanation of the offense
   - the policy or rule violated
   - summary of the actions taken to date (if applicable)

   Note: A representative from Human Resources may also be present, as appropriate. NUP 20, "Termination of Employment," provides additional guidelines and notification requirements for terminating the employment of Company personnel.

3. The supervisor will CONDUCT the termination with the individual while another member of management is present.

4. Refer to NUP 20, and PERFORM the applicable actions for a termination.

**References**

- Code of Conduct and Ethics from employee handbook, *You and Your Job*

- NUP 20 *Termination of Employment*

- NUP 23 *Employee Grievances and Complaints*

- Applicable collective bargaining agreement

## Attachment 1
## Definitions

**Progressive Corrective Discipline**
A process whereby corrective action taken with an employee occurs in progressive, escalating steps. Generally, the steps start with an oral reprimand, followed by a written reprimand, then by a suspension for a prescribed period, and finally termination. However, the process may start at any step in the process, given the seriousness of the offense and the existence of mitigating or aggravating circumstances.

**Oral Reprimand**
A verbal advisory given to an employee that identifies the problem/offense and the corrective action the employee must take to prevent recurrence. The oral reprimand is documented and maintained in the supervisor's file.

**Written Reprimand**
A written warning given to an employee that identifies the problem/offense and the corrective action that the employee must take to prevent recurrence. The written reprimand is maintained in the employee's personnel file.

**Suspension**
Time off without pay for a specified period of time. Records or letters documenting a suspension are maintained in the employee's personnel file.

**Termination**
To discharge a person from employment with the Company.

## Attachment 2
## Responsibilities

First Line Supervisors
- Assemble and document the facts surrounding an issue in order to determine what action should be taken.

- Participate in the recommendation of appropriate action to be taken.

- Take timely disciplinary action with employees when warranted, and as soon as practical.

- Recommend the Employee Assistance Program to employees as appropriate.

- Communicate management expectations to employees.

Managers and Supervisors
- Inform management and Human Resources of situations that may require attention and action.

- Ensure timely disciplinary action is taken in situations where it is warranted and as soon as practical.

- Communicate management expectations to first line supervisors and their employees.

- Ensure all disciplinary actions receive appropriate approvals.

Directors
- Ensure supervisors and managers know the progressive corrective disciplinary process.

- Ensure all cases of disciplinary action requiring suspension and termination are carried out in a timely manner and in accordance with these guidelines and other Company administrative policies.

- Communicate expectations of management to first line supervisors and their employees.

Human Resources Personnel
- Provide overall structure and coordination for the disciplinary process.

- Consult with supervisors and management in all cases requiring disciplinary action.

- Recommend/approve disciplinary action, including duration and type.

## Attachment 5

| LISTING OF OFFENSES | Range of Discipline* |
|---|---|
| **Please Note:** This table is not all inclusive. The level of discipline will vary depending on the severity of the offense and the existence of any mitigating circumstances or escalating factors. Contact a Human Resources representative for disciplinary guidance and suggestions. | |
| Failure to wear required protective equipment | S → T |
| Failure to wear fire retardant clothing | S → T |
| Failure to ground for protection of personnel | S → T |
| Failure to properly barricade | S → T |
| Failure to provide cover-up on overhead lines | S → T |
| Failure to properly shore excavations | S → T |
| | |
| **Industrial Safety (Not Life Threatening)** | O → T |
| Failure to wear prescribed safety gear | W → T |
| Failure to report occupational accidents | W → T |
| Tagging violation | W → T |
| Vehicle speeding in protected area | O → T |
| Horseplay | O → T |
| Smoking in unauthorized area | O → T |
| Failure to wear badge properly | O → T |
| Unauthorized entry to vital area | S → T |
| Permitting tailgating | W → T |
| Possessing prohibited item – in Protected Area | S → T |
| Attempting to introduce prohibited items into protected area | O → T |
| Mutilating/defacing security badge | W → T |
| Failure to report security violation | O → T |
| Failure to lock vehicle in protected area | |
| | |
| **Procedural Compliance** | O → T |
| Failure to follow procedure - inadvertent | S → T |
| Failure to follow procedure - deliberate | O → T |
| Failure to take appropriate action when procedure will not attain desired results | S → T |
| Fraudulently signing off a procedure | |
| | |
| **Radiological Protection** | W → T |
| Failure to frisk | S → T |
| Frisk - contamination disregarded | O → T |
| Decontamination not documented | O → T |
| Inadequate frisk | O → T |
| Failure to follow RWP | S → T |
| Violation of High Rad Key | O → T |
| Failure to properly wear dosimetry | W → T |
| Eating, drinking or smoking in radiological areas | |

*Discipline -   O = Oral Reprimand
W = Written Reprimand
S = Suspension
T = Termination

| NORTHEAST GENERATION SERVICES<br>MT. TOM STATION | ARBITRATION OPINION & AWARD<br>Susan R. Brown, Arbitrator |
|---|---|
| and | Gr. R. Scruggs |
| I.B.E.W., LOCAL 455 | DATE OF AWARD: 20 December 2002 |

The undersigned Arbitrator, selected by the parties in accordance with their 2001-2004 collective bargaining agreement, held hearings on 27 August and 11 October 2002 in Holyoke, Massachusetts to consider the discharge of Richard Scruggs. Richard Voigt, Esq. of Cummings & Lockwood represented the Company; James O. Hall, Esq. appeared for the Union. Both parties submitted post-hearing briefs.

## STIPULATED ISSUES

Did the Company have proper cause to discharge the Grievant, Richard Scruggs, on 12 April 2002?

If not, what shall be the remedy?

## BACKGROUND

Mt. Tom Station is a large generating facility in Holyoke, Massachusetts the entrance to which is controlled by a motorized gate. In addition to a variety of tanks, pipes and other facilities on the property, there are two buildings: the Storeroom, located right inside the gate, and a larger structure, containing both the main power plant and administrative offices, located deeper inside. All employees park across from

the main building offices except Storeroom employees, who have a separate parking area near the gate.

Several trucks are used in the day-to-day business of the plant, including a gasoline-fueled pick-up and a diesel dump truck. Vehicles are not assigned to specific employees but are used as needed.

Kept inside each truck is a Company gas credit card issued by an organization called Wright Express; these are commonly referred to as WEX cards. Any employee using a truck may purchase needed fuel at any service station with the card for that truck. Before a purchase is authorized, the employee must enter a PIN, which is noted on the face of the card, and the truck's odometer reading. WEX supplies the Company with a monthly printout indicating card usage: i.e., truck identification, time, location, type of fuel, number of gallons and total sale for each purchase.

In December 2001, Station Manager John Murray was reviewing fuel purchase printouts and noticed that some premium-grade gas had been bought with Company credit cards. He instructed Timothy Brassil to remind employees of the Company's gas purchase policy and Mr. Brassil did so in the following memo to all Mt. Tom employees dated 11 December:

> PLEASE BE ADVISED THAT WHEN RE-FUELING OUR COMPANY
> VEHICLES, THAT WE SHOULD ONLY BE USING <u>REGULAR
> UNLEADED FUEL.</u> AT THE TIME OF RE-FUELING, WE ALL NEED
> TO RECORD THE ODOMETER READING ACCURATELY.
>
> ANYONE WHO HAS ANY QUESTIONS REGARDING THIS
> REQUEST, SHOULD CONTACT ME.
>
> THANK YOU ALL FOR YOUR ANTICIPATED COOPERATION.
> (Emphasis in original.)
>
>                                            (CX 3)

The premium purchases stopped for a while but in March, Mr. Murray noticed they had resumed and again spoke to Mr. Brassil. As a result, Mr. Brassil sent out another memo on 6 March, identical to that sent in December.

On 8 March, however, Mr. Murray received the following memo from William J. Nadeau, Vice President and Chief Operating Officer of Northeast Generation Services:

> I have reviewed the March invoices and find that we are back to the "super unleaded" issue for your F350 and F550 gas cards.
>
> Dennis will have a copy in his in-box and you will have a copy FAX'd to you this a.m. by Pat.
>
> Please respond on what you are doing to stop this mis-use and whether we need to bring in the Security Dept into this.
>
> (CX 5)[1]

As a result of this note, Mr. Murray scrutinized the gas purchase records for several previous months. He testified that he found numerous instances of premium gas purchases, even on the credit card for a diesel truck. All these purchases were for approximately 15 gallons although the trucks in question have tank capacities of 38 to 40 gallons. Most of the improper purchases occurred on Mondays and Fridays between 11:30 a.m. and 1:30 p.m. although some were on other days and times.

Mr. Murray concluded from this information that the purchases were suspicious rather than inadvertent, as he had first believed. In order to have a better overview of the data, at some point he asked WEX to supply him a special report for the four cards that had the highest activity.[2]

---

[1] F350 is the designation for a gas pick-up and F550 for a diesel dump truck.

[2] The regular monthly reports are for all Company trucks, some of which get filled only once a month. The special report covered a six-month period showing all activity for each of the specified cards.

The records for the four credit cards contained the following information  The F350 card for a pick-up truck showed 38 transactions between 27 September 2001 and 12 March 2002, 18 of which were for premium gas.  The F550 card for a diesel dump truck indicated 19 transactions between 1 October and 18 March, all but three for premium gas; the others were for diesel.  The spare gas card, which is used for containers and small engines, had 22 transactions in approximately the same period, none for premium fuel.  The final card, for a loaner Silverado, had 29 transactions, five of which were for premium fuel.

In order to investigate this matter further, Mr. Murray called the corporate Security Department and consulted with Manager of System Securities Scott McKenzie.  Mr. McKenzie asked Mr. Murray several questions about the situation, including on what basis he had concluded fraud was involved, which employees were permitted to leave the plant at lunchtime, and who could leave the plant without being seen.  Mr. Murray told him that all employees were permitted to leave the premises during their lunch break and that Storeroom employees, because their cars were parked close to the gate, were least likely to be seen.

Mr. McKenzie set up a surveillance operation consisting of two investigators, one stationed on the road near the plant entrance and one at a Mobil Station several miles north in the town of Northampton, where the bulk of the premium gas purchases had occurred.  The idea was for the investigator near the gate to watch for private vehicles exiting the plant and heading north.  He would call the investigator located at the Mobil station with the make and license of the car.  If that car got gas at the station, the

second investigator would videotape the driver on a timed tape which could later be checked against WEX transaction records.

Mr. McKenzie and Senior Investigator Roy Cramer started surveillance on 15 March. They watched from about 10:00 a.m. to 3:30 p.m. that day but no private cars left the plant. When they decided to quit for the day, Mr. McKenzie drove south on Route 5 from the Mobil where he had been stationed. As he reached the plant access road, a vehicle pulled out ahead of him and traveled south to another Mobil station in the town of Holyoke, also a location where some suspicious purchases had been made. Mr. McKenzie videotaped the purchase and then called Mr. Murray with the information. The report Mr. Murray ultimately got from WEX showed no inappropriate purchase with a Company card at that time; in fact, no Company card was used on that day at all.

The investigators returned on 18 March to resume surveillance. This time Mr. McKenzie was at the plant and Mr. Cramer was at the station. At about 11:45 a.m., Mr. McKenzie saw a black GMC Jimmy exit the plant and head north; he so notified Mr. Cramer. Mr. Cramer videotaped a man pumping gas; his voice-over on the tape notes the time as 11:47.

Mr. McKenzie viewed this tape on the same day. He called Mr. Murray and described both the day's events and the person taped buying the gas. From the description, Mr. Murray guessed the employee was Storekeeper Richard Scruggs, one of the two employees who worked in the Storeroom. Mr. McKenzie looked up Mr. Scruggs' identification photo in the security files and identified him as the man on the tape. Some time later, WEX data indicated that the F550 credit card had been used to

purchase 14.3 gallons of unleaded plus fuel at 11:48 a.m. on 18 March at the Northampton Mobil where the video was taken.

Mr. McKenzie and Mr. Cramer renewed their surveillance on 25 March; Mr. Cramer was at the plant and Mr. McKenzie at the Northampton Mobil. At 11:31, Cramer notified McKenzie that a gray Lincoln Mark III was heading north from the plant. Mr. McKenzie taped the car pulling up to a pump at the Mobil station. Mr. Scruggs emerged from the Lincoln, went up to the pump with a credit card in his hand and lifted it to the card slot in the pump. After looking intently at the pump for a moment, he got back into his car and drove north without pumping gas.[3]

Both Mr. Cramer and Mr. McKenzie followed Mr. Scruggs' car, which pulled into a Shell station a short distance away. Mr. McKenzie taped the car parked at a pump but was not in a position to video Mr. Scruggs' actions because they were shielded from view by the pump itself. Mr. Scruggs' car was there for about one and a half minutes, then Mr. Scruggs got back in and drove away; the time on the videotape is 11:37.

Immediately thereafter, Mr. McKenzie photographed the information on the pump where Mr. Scruggs had been parked. It stated that 13.23 gallons of fuel had been purchased for $18.77 at a cost of $1.419 per gallon. The type of fuel is not specified on the pump and the prices of the various grades cannot be read; it is evident, however, that the price for regular that day was $1.30-something – the 1 and 3 are clearly visible. WEX records indicate that the F350 credit card was used at 11:31 a.m. on 25 March at the Northampton Shell to purchase 13.2 gallons of unleaded plus fuel for $18.77.

---

[3] The controversy about whether Mr. Scruggs actually put his card into the pump before he left is addressed below.

Richard Scruggs had been employed with the Company since 1978, holding various positions until he was awarded the Storekeeper bid in 1996. As Storekeeper, he purchased and distributed supplies needed at the plant; to this end, he had a Company credit card, called a P-card, at his disposal. There is no evidence in the record of any disciplinary actions against him.

Mr. Scruggs was interviewed on 5 April by Mr. McKenzie and Mr. Cramer in the presence of Shop Steward Clarence Kaye. He was asked questions about his use of both the P-card and the gas credit cards and denied using either of them for personal items. He could not at that time recall whether he had used the WEX card for gas on either 18 or 25 March but said it would have only been for a Company vehicle in any event, as he never used the Company card for his private vehicles. At the end of the interview, Mr. Scruggs was suspended pending further investigation. On 12 April, he was terminated for "unauthorized use of Company fuel credit card for personal use." (JX 2)

At arbitration, Mr. Scruggs testified that after his interview, he reconstructed what he had been doing on the days in question. He said he was driving the Jimmy on 18 March because it was snowing and he took it to be "topped off" at lunchtime because he did not like to stop after work. He testified that he used his own credit card.

He recounted that on 25 March, he went to gas up at the Mobil, put his credit card in and had it rejected because he had failed to pay the bill. He then drove to the Shell station, which was the only place he could get a particular type of Snapple he likes, bought the drink and a few scratch tickets, and returned to work. He purchased no gas.

It is undisputed that Mr. Scruggs did not offer these explanations during the grievance procedure.

### POSITIONS OF THE PARTIES

The Company asserts that the evidence confirms that Mr. Scruggs is guilty as charged. His contrived explanations do not jibe with the videotape and the purchase records. The WEX reports are extremely specific with respect to both time and location of purchases with the Company gas card, the same times and locations at which Mr. Scruggs was videoed. The Union, despite its complaints about the validity of the WEX reports, has made no showing that they are inaccurate. Theft of this nature merits termination, in spite of Mr. Scruggs' long service record. The Company should not be required to retain an employee who cannot be trusted with Company property, a principal upheld by most arbitrators. The grievance should be denied.

According to the Union, the evidence does not establish the Grievant's guilt and Mr. Scruggs has provided reasonable explanations for his actions. For an offense like stealing, the Company must provide the most certain, unequivocal and irrefutable evidence of guilt, which it has failed to do. The third-party records could not be authenticated and were shown at arbitration to be at least unreliable, if not a sham. A record produced by WEX for the Company in early March showed the transaction of 18 March for which Mr. Scruggs was charged with theft, establishing that the records cannot be trusted. The Arbitrator should throw out all the WEX so-called evidence as totally worthless.

Without such evidence, the videotapes are meaningless. There is nothing to show that Mr. Scruggs used the Company card on 18 March or even pumped gas on 25 March. Even the Department of Employment Security found the Company failed to prove its case. The Arbitrator should sustain the grievance, reinstate Mr. Scruggs and make him whole.

### OPINION

At the outset of this case, I must note that Mr. Scruggs has been charged with a serious offense, one that cannot be tolerated by any employer. An employee who is entrusted with protecting Company property and funds must live up to that trust. A long service record does not mitigate the penalty when theft, particularly systematic theft, is involved. The only question here is whether the Company has borne its burden of proving that Mr. Scruggs is guilty as charged. If it has, termination is the proper penalty.

There is no doubt that the Employer must provide clear and convincing proof of guilt in order to have a discharge sustained. In this case, the Union has challenged as unreliable the evidence most central to the Employer's case, the WEX records.

First, the Union points out that the records are hearsay and do not meet the hearsay exception of records kept in the normal course of business, since the ones relied on were compiled at the Company's special request. These points are both true but do not necessarily render the evidence inadmissible or unreliable.

Although it is true that the WEX records are not Company records, certain WEX documents are received by the Company in the normal course of business. Documents of this nature – telephone bills, invoices, doctor's notes – are routinely accepted in

arbitration without requiring authentication by the vendor. Such a practice would render arbitration even more time-consuming and costly to both parties than it already is.

It is also true that the WEX documents produced at arbitration (CX 6 and CX 15) are not in the format generally sent to the Company; they consist, however, of the same data arranged in a different order, produced at the request of the Company. The Company provided the Union with all the original monthly reports, i.e., the back-up data for the special formats, and the Union made no showing that the two sets of data did not jibe. The reformatted data have the same status, therefore, as any visual aid the Company might have drawn itself, except created by the entity that houses both the data and the computer, and can be considered reliable absent a showing otherwise.

The Union's most serious charge is that CX 6, which includes the improper purchase of 18 March, is indicative of fraud on the part of the Company because the report was produced in early March, prior to that date. According to the Union, this is just one piece of a pattern that reveals the Company's attempt to single out and frame Mr. Scruggs for the gas fraud. Mr. Murray and Mr. McKenzie, according to the Union, immediately identified Storeroom employees as the most likely suspects and even went so far as to note when Mr. Scruggs was driving a different car. Subsequently, they made sure the evidence fit their assumptions.

I find no evidence whatsoever that Mr. Scruggs was pre-selected or framed by Company officials. The high incidence of premium fuel purchases clearly indicated a potentially serious fraud problem. As an investigator trying to focus his search, Mr. McKenzie correctly inquired whether some employees were more likely than others to leave the premises unnoticed; this was before he had seen the plant layout and before

he had learned that everyone is permitted to leave on his or her lunch break. The identification of Storeroom employees as more easily able to leave without notice does not make Mr. Scruggs an unfair target.

It is apparent from the record that most plant employees do not in fact leave the premises in personal vehicles during work hours. The investigators followed all three cars that exited during their watch; two of them turned out to contain Mr. Scruggs, whatever car he was driving. The WEX records matched two of the three purchases; both of those belonged to Mr. Scruggs.

A very close reading of the entire record does not lead me to conclude that CX 6 was contrived prior to 18 March in order to frame Mr. Scruggs. Such an accurate fabrication would require a coincidence of astronomical proportions: How could the Company have predicted early in March that Mr. Scruggs would leave the plant on 18 March and buy gas at 11:48 a.m. at the Northampton Mobil Station, a fact not denied by Mr. Scruggs? A more reasonable interpretation of the document rests in Mr. Murray's lack of clarity regarding exactly when and how often he ordered up WEX documents. There is no question in my mind that CX 6 and CX 15 are accurate reflections of actual use of the Company's credit cards.

Once these data are accepted and linked with the timed videotapes of Mr. Scruggs, there is little doubt that the Grievant used the Company card for his personal vehicles. While it is true that there is no definitive picture of Mr. Scruggs actually purchasing gas for his vehicle with a Company credit card, this is not unusual evidentiary situation. It is rare that employees are caught in the act of stealing; rather, guilt is usually inferred from circumstantial evidence. In order to be convincing, such an

inference must be strong; if an employee can offer a reasonable alternative explanation to an otherwise obvious conclusion, the employer will not have met its burden.

Here we have two occasions where a timed video of Mr. Scruggs matches exactly, by time and location, a purchase of premium gas with a Company credit card. For the first occasion on 18 March, the Grievant has no explanation other than denial and a charge of being framed. We have already dismissed the frame-up theory; the denial does nothing to explain why the purchase data matched the tape. Absent some plausible alternative, we can only conclude that Mr. Scruggs was the person who made the purchase of premium fuel with the Company credit card on that exact day at that exact time.

Mr. Scruggs did offer an alternative explanation with respect to the 25 March occasion. He testified that when he tried to get gas at the Northampton Mobil, his card was denied because he had failed to make a payment, and he left. I find this implausible on several counts. First, the Grievant offered no concrete evidence that his credit card had been cancelled, although he maintained that the credit card company had sent him a notice to that affect. Second, a very careful study of the videotape leads me to conclude that Mr. Scruggs did not actually insert his card into the machine but rather held it up to the pump, paused while he read something, and then turned away without initiating a purchase.

This observation is supported by the investigators' testimony that there was a sign on the pump which required credit card users to go inside the station because the card reader was broken. Without a card reader the Grievant would have been required to

call WEX for authorization, inextricably linking him to the purchase of premium fuel. He left instead.

Mr. Scruggs also testified that although he next went to another gas station, he did not buy gas there but only a drink and some scratch tickets. I find this also implausible and not supported by the evidence. First, he provided this story only after he saw that the videotape did not actually show him pumping gas. Second, he parked at a pump, not by the shop that sells drinks and tickets. Third, a close examination of the tape reveals that Mr. Scruggs' distinctive white baseball cap appears twice in the frame, just before he re-emerges and gets into his car. Both appearances show him ducking his head between the pump and the rear of his car, consistent with the familiar movements required to remove the nozzle from the car and then to replace the gas cap. There would be no reason for him to have been in that spot if he had only been returning from the store: the driver's door was on the side of the car away from the pump and the gas tank. Fourth, a transaction matching the WEX records was found on the pump immediately after the Grievant departed. The only reasonable explanation for these facts is Mr. Scruggs' guilt.

As noted above, the Grievant's long service record does not serve to mitigate this type of misconduct. This is particularly true where the employee's position encompasses unsupervised responsibility for Company assets. The grievance is denied.

Northeast Generations Services, Mt. Tom Station/I.B.E.W., Local 455                    Page 14

## AWARD

The Company had proper cause to discharge Richard Scruggs.

The grievance is denied.

Dated:  20 December 2002                        _Susan R. Brown_

Susan R. Brown, Arbitrator

# Northeast Generations Services
## Mt. Tom Station

### and

## INTERNATIONAL BROTHERHOOD OF
## ELECTRICAL WORKERS
## LOCAL UNION 455



## AGREEMENT
### October 1, 2001

263·c

# TABLE OF CONTENTS

| ARTICLE | PAGE |
|---|---|

**Introductory**
1 Purpose ..... 1

**Union-Management Responsibilities**
2 Recognition and Scope ..... 2
3 Union Membership and Activities ..... 2
4 Payroll Deduction ..... 4
5 No Discrimination Against Union Members ..... 4
6 Safety ..... 5
7 Loyalty ..... 6
8 Work Stoppages ..... 6

**Workday, Week, Schedules**
9 Classification and Wages ..... 7
10 Hours of Work ..... 7
11 Call-In ..... 11
12 Rest Period ..... 12
13 Shift Differential ..... 13
14 Overtime ..... 13
15 Sunday Premiums ..... 14
16 Meals During Overtime ..... 15
17 Noon Lunch ..... 16
18 Standby Pay ..... 16

**Vacations, Holidays, And Excused Absences**
19 Vacations ..... 17
20 Holidays ..... 20
21 Armed Forces Reserve Training ..... 22
22 Jury Service ..... 23
23 Funeral Leave ..... 23
24 Employees Called Into Military Service ..... 25
25 Sick Leave ..... 26
26 Occupational Accidents ..... 27
27 Retrogression ..... 28

**Benefit Plans**
28 Health Care Plan ..... 29
29 Group Insurance Benefits ..... 29
30 System Retirement Program ..... 30

**Settlement Of Disputes**
31 Grievance Procedure and Arbitration ..... 30

**TENURE OF EMPLOYMENT**
32 Temporary Employment ..... 34
33 Probationary Employment ..... 34
34 Substitution and Temporary Assignment ..... 35
35 Promotions ..... 36
36 Notice of Leaving by Employee ..... 38
37 Discharge of Employees ..... 39
38 Reduction in Forces ..... 40

**General Provisions**
39 Notice and Requests for Meeting ..... 42
40 Construction and Limitations ..... 43

**Duration And Renewal Of Agreement**
41 Term of Agreement ..... 43

**Appendix A - Schedule A**
Classification List and Schedule of Wages ..... 46

**Appendix B**
Dues Authorizations, and Letters of Understanding .... 67

| Title | Page |
|---|---|
| Safety Regulation—New or Changed | 71 |
| Sampling and Testing | 84 |
| Shift Differential | 13 |
| Sick Leave | 26 |
| Standby Pay | 16 |
| Substitution and Temporary Assignment | 35 |
| Successor Employer | 96 |
| Sunday Premiums | 14 |
| System Retirement Program | 30 |
| Temporary Employment | 34 |
| Term of Agreement | 43 |
| Triple-Indemnity Life Insurance | 74 |
| Union Membership and Activities | 2 |
| Vacations | 17 |
| Work Stoppages | 6 |

AGREEMENT entered into this first day of October, 2001, between Northeast Generation Services (NGS), hereinafter called the Company, and LOCAL 455 of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, hereinafter called the Union.

# ARTICLE 1
## Purpose

1. As an inducement to the execution of this Agreement by the Company, the Union represents and warrants that a majority of the employees whose wages and conditions of employment are covered by this Agreement are active members of said Local 455 and that the Union has been designated by said majority to be their exclusive representative for the purpose of collective bargaining in respect to rates of pay, hours of employment, or other conditions of employment, and

2. Both the Company and the Union desire to promote harmony and efficiency among the above-mentioned employees so that they and the Company may obtain mutual economic advantages consistent with the duty of the Company at all times to provide an adequate and uninterrupted service for the customers which it now serves or may in the future serve.

3. This Agreement, shall be binding on any and all successors and assigns of the Employer, whether by sale, transfer, merger, acquisition, consolidation or otherwise. The Employer shall make it a condition of transfer that any such successors or assigns shall be bound by the terms of this Agreement.

# INDEX

| Title | Page |
|---|---|
| Access Letter | 89 |
| Active Duty–Civil Disturbance or Natural Disaster | 72 |
| Appliance Purchase Program Letter Dated July 19, 1976 | 77 |
| Appliance Purchase Program Letter Dated July 20, 1976 | 78 |
| Arbitration Procedure | 30 |
| Armed Forces Reserve Training | 22 |
| Assistant Business Managers Paid for Third-Step Grievance Meetings | 95 |
| Call-In | 11 |
| Child Care Referral Services | 93 |
| Classification and Wages | 7 |
| Classification List and Schedule of Wages | 46 |
| Construction and Limitations | 43 |
| Cross Rostering | 87 |
| Dependent Day Care | 94 |
| Discharge of Employees | 39 |
| Employees' Safety Committee | 75 |
| Form for Union Dues Deduction | 67 |
| Funeral Leave | 23 |
| Grievance Procedure | 30 |
| Group Insurance Benefits | 29 |
| Holidays | 20 |
| Hospital and Surgical Benefits | 29 |
| Hours of Work | 7 |
| Illness or Injury Immediately Preceding or During Scheduled Vacation | 73 |
| Jury Service | 23 |
| Long-Term Care | 91 |
| Loyalty | 6 |
| Meals During Overtime | 15 |
| Military Service, Employees Called Into | 25 |
| Miscellaneous Understandings—1976 Negotiations | 79 |
| Miscellaneous Understandings—1982 Negotiations | 81 |
| Miscellaneous Understandings—1984 Negotiations | 82 |
| Miscellaneous Understandings—1986 Negotiations | 85 |
| No Discrimination Against Union Members | 4 |
| Noon Lunch | 16 |
| Notice and Requests for Meeting | 42 |
| Notice of Leaving by Employee | 38 |
| Occupational Accidents | 27 |
| On-Site Reporting—Expense Allowances | 68 |
| Operator's Assistant | 83 |
| Overtime | 13 |
| Paid Time Off for Massachusetts State License Exam | 86 |
| Payroll Deduction | 4 |
| Probationary Employment | 34 |
| Promotions | 36 |
| Purpose | 1 |
| Recognition and Scope | 2 |
| Reduction in Forces | 40 |
| Rest Period | 12 |
| Rest Period—Mt. Tom Station Overhaul, Etc. | 76 |
| Retrogression | 28 |
| Safety | 5 |

# UNION-MANAGEMENT RESPONSIBILITIES

## ARTICLE 2
### Recognition and Scope

1. The Company recognizes Local 455 of the International Brotherhood of Electrical Workers to be, for the purposes of collective bargaining, the exclusive representative of the employees of the Company in its Production and Operations Departments, whose wages and conditions of employment are covered by this Agreement.

2. The provisions of this Agreement shall apply only to employees of the Company whose classifications of employment and schedule of wages are attached hereto.

## ARTICLE 3
### Union Membership and Activities

1. Employees who are members of the Union on July 26, 1968, or later become members, will as a condition of employment be required to maintain their membership for the duration of this Agreement.

2. Employees hired or transferred into the bargaining unit after July 26, 1968, will be required as a condition of employment to become a member of the Union three (3) months from the date of their employment or transfer.

3. If an employee who is required to join the Union or maintain membership as above provided, fails or refuses to do so, the Union may request the Company in writing to discharge such employee, and the Union

2

will send a copy of such notice to the employee. The employee will be discharged ten (10) days after the Company receives such notice unless the employee complies with the above membership provisions within the ten (I0) day period, and subject to paragraph 4 below.

4. If there is a dispute over the application of the above provisions to any particular employee, pending the settlement of the dispute under the grievance and arbitration provisions of the Agreement, the employee will not be suspended or discharged for nonmembership in the Union, provided that the Union may submit the dispute immediately to Step 3 of the Grievance Procedure and Arbitration of Article 31.

5. Notwithstanding any other provision of this Article, the obligation of the employee under this Article to become or remain a member of the Union, will not be effective earlier than the thirty-first day following the effective date or execution date of this Agreement, whichever is later.

6. Upon written request from the Union, the Company will grant a leave of absence for up to one year to an employee who is elected to the office of a full-time Union representative for the local Union. All Company benefits will cease during any such leave of absence, except upon request in writing by the Union, the Company will maintain the employee's insured benefits during such leave of absence so long as the Union pays all costs required to maintain such benefits. The employee's seniority status will be such as may be mutually agreed upon by the Company and the Union. Such leave of absence may be extended by the Company upon application for an extension in writing by the Union. No more than one employee from the

3

Company will be granted a leave of absence under this paragraph 6 at any one time without the mutual consent of the Company and the Union.

## ARTICLE 4
### Payroll Deduction

1. During the term of this Agreement, the Company will deduct Union membership dues weekly in the amount fixed in accordance with the Constitution and Bylaws of the Union from the wages of each employee who authorizes the Company to do so in writing in the form attached marked Appendix B. The Union shall notify the Company in writing as to the amount of such dues. The authorization shall be irrevocable for a period of one year or until the termination date of this Agreement, whichever occurs sooner.

2. The amount so deducted each week shall be paid by check payable to the local Union and forwarded to the Treasurer of the local Union, or to such other local Union officer thereof as shall be designated in writing by the local Union.

## ARTICLE 5
### MANAGEMENT
### No Discrimination Against Union Members

1. The Union recognizes that, subject only to the express provisions of this Agreement, the supervision, management, and control of the Company's business, operations, and plant are exclusively the function of the Company, and the Union agrees for itself and its employees not to hinder or interfere with the

4

management of the Company, including the assignment of work, the direction of working forces, the right to hire, the right to suspend or discharge for proper cause, the right to transfer employees to work for which they are better suited, and to furlough or lay off employees because of lack of work or for other cause, but, in the exercise of these responsibilities in management, the Company agrees that it will not discriminate against any member of the Union.

2. It is agreed that neither the Company nor the Union will discriminate against any employee in application of any of the terms of this Agreement because of race, color, religion, age, sex, national origin, ancestry, marital status, sexual orientation, disability, military status, veteran status or genetic information.

## ARTICLE 6
### Safety

1. The Company will continue to make reasonable regulations for the safety and health of its employees during their hours of employment, and the Union agrees that its members employed by the Company shall comply with such regulations.

2. The Company will provide suitable eyeglass shields to employees when they are assigned to work in cramped or narrow spaces or during other work assignments when they might reasonably be needed for protection of eyeglasses.

3. The Union also agrees that its members will use the protective devices, wearing apparel, and other equipment to be provided in accordance with the

5

present practice of the Company for the protection of employees from injury.

## ARTICLE 7
### Loyalty

The Company and the Union agree to continue their cooperative efforts to promote safety, efficiency, and harmony among all the employees and to use their influence and best endeavors to protect the interests and property of the Company, and to promote and advance the welfare of the Company and its service at all times.

## ARTICLE 8
### Work Stoppages

1. The Union agrees that, during the term of this Agreement, it will not authorize or approve any strike, walkout, or a stoppage or slowdown of work, and the Company agrees that, during the term of this Agreement, there will be no lockout. The Union further agrees that it will take every reasonable means within its powers to induce employees who are members of the Union, and subject to its discipline, to terminate any strike, walkout, or stoppage or slowdown of work in which they may be engaged.

2. Each employee agrees they will not, during the term of this Agreement, engage in any strike, walkout, or stoppage or slowdown of work; but neither the Union nor any of its officers or official representatives shall be responsible for or be sued by reason of any strike, walkout, or stoppage or slowdown of work which has not been authorized or approved by the Union.

6

## WORKDAY, WEEK, SCHEDULES

## ARTICLE 9
### Classification and Wages

1. Classifications of employees whose wages and conditions of employment are covered by this Agreement are mutually agreed to be, on the date of this Agreement, as shown on the Classification List and Schedule of Wages hereto attached as Appendix A.

2. During the period of this Agreement, hourly rates of pay for each classification shall be in accordance with the Classification List and Schedule of Wages hereto attached as Appendix A.

## ARTICLE 10
### Hours of Work

1. The regular hours of employment for all Employees, other than Employees employed on a shift basis, shall be up to ten (10) hours per day and forty (40) hours per week. A day may be a calendar day or any twenty-four (24) hour period and a week may be a calendar week.

2. The normal workweek for all Employees, excepting Employees who are employed on a shift basis, shall be scheduled between Monday and Friday inclusive, between the hours of 6:00 a.m. and 6:00 p.m. The Employer may change such workweek if required by federal or state authorities or to meet conditions due to a serious emergency or major equipment failure or to fill a temporary vacancy, but upon the termination of such conditions or vacancy, the Employer shall reinstate such workweek for each Employee whose workweek was changed in accordance with this

7

provision. Work Schedules, within the normal workweek, will be determined by the Company and posted and may include a straight eight-hour shift without a designated lunch period. Saturdays will be included as part of the normal workweek for certain Mechanics, Instrument Technicians and Instrument Specialists at Mt. Tom.

3. An overtime rate of one and one-half (1½) times the hourly rate of a regular and probationary Employee will be paid to such Employee for all hours worked over the normal workday and for all hours worked over the normal workweek.

4. The Company shall have the right to assign Employees to work on a shift basis whenever, in its judgment, circumstances may require. This includes second shift coverage during maintenance outages. An Employee so assigned shall be entitled to a shift differential. During any week when a person works on shift or partly on shift and partly on maintenance, the Employee's workweek shall consist of any four (10 hour) or five (8 hour) consecutive days. The Company agrees not to abuse its right to work a person partly on shift and partly on maintenance.

5. An Employee who reports for work at the Employee's scheduled starting time, or who reports to work at a specified time at the direction of the Employee's supervisor shall be credited with two hours of work if the Employee is told to leave without working and report back at a different time.

6. Routine schedules of normal work coverage for employees who are assigned to operating and rotating day shifts are made to meet the continuous nature of

8

the Company's operations. It is the policy of the Company to arrange such schedules so that (1) shifts are adequately covered without unnecessary overtime payments; and (2) employees are treated fairly and reasonably. Work schedules will normally be posted not less than ten (10) days in advance of the starting of the schedule. This policy in no way precludes the Company from changing a routine schedule due to changed conditions after it has been posted, subject to the notice and penalty provisions set forth below. Except for Relief Men, when an Employee's normal work schedule is changed with less than seventy-two (72) hour's advance notice, any time worked within the new normal schedule which was not normal work time under the old schedule will be paid for at one and one-half (1½) straight-time rates until the advance-notice period has expired, except when other rates are applicable, and excepted further that when an Employee's normal work schedule is changed to provide relief coverage because of sickness or other unexpected absences of Employees, forty-eight (48) hours shall be the advance-notice period for application of greater than straight-time rates. An Employee may be returned to the Employee's previous normal schedule without advance notice.

7. In respect to Employees unloading coal at Mt. Tom, if, on a particular day, they are scheduled for such work at a time other than this normal schedule and within fourteen (14) hours prior to their normal schedule for that day, the anticipated arrival time of a unit train is changed so as not to require the Employees to report when scheduled, the Employees will be notified they have the option of (1) coming in for work on their regular schedule; or (2) coming in at the time scheduled for that day.

9

8. A Fuel Handler at Mt. Tom whose normal schedule begins at 2:00 p.m. and who is required to report for work before 7:00 a.m. the next day will be paid a special payment in the amount of one (1) hour's pay at time and one-half in addition to the Employee's pay for time worked, provided the Employee has worked at least eight (8) hours on such normal schedule.

9. All hours for travel time or work time paid at straight-time rates under the terms of this Agreement will be paid at double straight-time rates when Employees are assigned to emergency work for other utilities in locations or upon facilities other than those owned or operated by the Northeast Utilities System and the Connecticut Yankee Atomic Power Company.

10. Except when assigned to standby duty under the provisions of Article 18, an Employee who reports for overtime work on a regularly scheduled day off, having been assigned prior to the end of the next preceding workday, will be provided with a minimum of four (4) hours' work or pay at applicable overtime rates. Employees assigned to standby duty will be covered by this clause when they are working as part of a crew or unit of two or more persons.

11. If an Employee is required to work beyond sixteen (16) consecutive hours, the Employee will be paid at double the straight-time rate for those hours worked beyond sixteen, until the Employee is allowed eight (8) consecutive hours off. Time allowed off for meals will be counted in determining sixteen (16) consecutive hours. Any part of such eight (8) consecutive hours off which extends into the Employee's normal work schedule will be paid for at straight-time rates. When service requirements will not permit allowing as earned

10

rest time off that part which may extend into the normal schedule, such rest time worked will be paid for at double straight-time rates. Triple time will not be paid.

**ARTICLE 11**

Call-In

1. An employee called out from home at times other than the Employee's regular hours of employment shall receive a minimum payment of two and one-half (2½) hours' pay (including travel time) at the applicable overtime rate except that when the Employee is so called out between the hours of 12:00 midnight and 6:00 a.m., the Employee shall receive a minimum payment of three (3) hours' pay (including travel time) at the applicable overtime rate. If the call-in time worked becomes continuous into the regular workday, the employee shall be paid the time actually worked plus travel time one way.

2. An employee called out at times other than the Employee's regular hours of employment shall return to the Employee's station after the assigned work has been completed and checked out, and unless further calls have been received; further troubles have developed; or further trouble is reasonably expected from current potential storm warnings, flood warnings, or other acts of God, the Employee will not be required to remain on the job to fill out the minimum call-out time.

11

## ARTICLE 12
### Rest Period

1. An employee who is required to work sixteen (16) consecutive hours or more will, except in emergency, be allowed a period of eight (8) hours' rest before returning to work. Any part of such rest period which extends into the employee's next normal work schedule will be paid for at straight-time rates.

2. An employee called in for work for one (1) hour or more (more than two hours for prearranged overtime) during the eight (8) hours immediately preceding the Employee's next normal schedule will, except in emergency, be allowed a rest during that normal schedule equal to the number of hours so worked except that eight hours rest time will be provided if an employee is required to work six consecutive hours. This rest period will be paid for at straight-time rates.

3. If such an employee is called in to perform work outside of the Employee's normal schedule for more than two (2) hours during the eight (8) hour period immediately preceding the starting time of a prearranged overtime period on a scheduled day off, the Employee will, whenever possible, be allowed rest time during that prearranged overtime period for which the Employee will be paid straight-time rates. The rest time shall be equal to the number of hours worked during the above eight (8) hour period except that eight hours rest time will be provided if an employee is required to work six consecutive hours. When service requirements will not permit allowing all of the rest time off, that part worked will be paid for at two (2) times the straight-time rate. Triple time will not be paid.

12

## ARTICLE 13
### Shift Differential

1. All employees working on shift will be paid, in addition to their basic hourly rate, one dollar and twenty-five cents ($1.25) per hour for hours worked on the second or afternoon shift and for all hours worked on the third or night shift.

2. The second or afternoon shift is defined as that shift which normally commences at 3:00 p.m.

3. The third or night shift is defined as that shift which normally commences at 11:00 p.m.

4. Payments under this Article will be made only for hours actually worked on the second or third shift.

## ARTICLE 14
### Overtime

1. So far as practicable, when overtime work is necessary, it will be distributed equitably among employees within group or classification. Records of such overtime will be posted monthly.

   a. Overtime work will be assigned to regular full-time employees who are reasonably available, in preference to temporary employees. An employee is not reasonably available when on vacation, assigned or otherwise. However, the Company will not be expected to incur extra costs beyond the normal premiums in distributing the overtime work.

   b. Relief men shall be assigned overtime in the classifications in which they relieve, based on their total number of overtime hours worked.

13

c. Charged hours will be used on all excused overtime for scheduled overtime assignments.

2. No employee shall receive more than the highest applicable overtime or premium payment for any work period. There will be no duplication or pyramiding of overtime or premium payments except that a license adder shall be considered as part of the base rate for the purpose of computing overtime payments for the periods when such premiums are applicable. Shift premium shall be applicable only for time actually worked by such an Employee. It shall be added to the Employee's regular hourly rate after computing the Employee's overtime pay and after computing the Employee's pay for work performed on a holiday.

### ARTICLE 15
### Sunday Premiums

1. Shift employees will be paid a premium of 25% of the base hourly rate for all straight-time scheduled hours worked on Sunday. No such premium will be paid for work which is performed at overtime rates.

2. This Sunday premium will be paid in addition to and separately from any other overtime or premium that may be applicable for these Sunday hours, and will not itself be subject to time and one-half or any other premium.

3. For purposes of this Article, the shift which normally commences at 11:00 p.m. on Sunday night is considered as Sunday work.

4. Employees with Sunday as a normal scheduled day off in any calendar week shall be paid double time for

14

work on that Sunday, and at time and one-half for work on the other normal scheduled day off in that calendar week. Employees required to work on a Sunday within their normal schedule in any calendar week shall receive time and one-half for work on the first normal scheduled day off and double time for work on the second normal scheduled day off in that calendar week.

### ARTICLE 16
### Meals During Overtime

1. In addition to overtime pay, an employee working more than two and one-half (2½) consecutive hours of overtime immediately prior to or after their normal scheduled workday, shall receive a meal allowance payment of twelve (12) dollars plus one-half (½) hour of overtime at the applicable rate to eat the meal. Should the employee work five (5) hours beyond that point, and at the end of each five (5) hour interval of work thereafter, the employee will again receive a twelve (12) dollar meal allowance plus one-half (½) hour of overtime at the applicable rate to eat the meal.

2. Whenever an employee is working a scheduled ten (10) hour workday and is going to be required to work more than one and one-half (1½) hours beyond their normal scheduled quitting time, the employee shall receive a meal allowance payment of $12.00 plus one-half (½) hour of overtime pay at the applicable rate to eat the meal.

15

## ARTICLE 17
### Noon Lunch

1. For regular day employees and shift employees, the normal lunch period will be from 12 noon to 12:30 p.m., subject to the following paragraphs.

2. Where a crew is split, the lunch period for part of the crew will be from 11:40 a.m. to 12:10 p.m. and, for the rest of the crew, from 12:15 p.m. to 12:45 p.m.

3. When operating conditions make it necessary for employees to work during their normal scheduled lunch period, an alternate lunch period of equivalent time will be designated by the Foreman or immediate Supervisor. The alternate lunch period normally will be designated to begin not more than one hour before or one hour after the starting time of the normal scheduled lunch period.

4. For those classifications which normally break for a half (½) hour lunch, the lunch period will begin four (4) hours after such scheduled starting time. The principles of paragraphs two and three of this Article will apply.

5. Shift employees in continuous operations may eat their lunch at an appropriate time during their shift without interrupting service, and the time spent eating lunch will be paid for as time worked.

## ARTICLE 18
### Standby Pay

1. Any Lineman may be assigned to standby service on Saturdays, Sundays, or Holidays. When on standby service, such Lineman will be expected to be

16

reasonably available for emergency calls and will at all times during the Employee's period of standby service keep the Regional Dispatch Center informed as to where the Employee may be reached by telephone.

2. Payment for standby service will be three hours' pay at straight-time rates for a twenty-four (24) hour period. Payment for any call-in will be made at the usual rate as covered elsewhere in this Agreement and will be in addition to the standby pay.

## VACATIONS, HOLIDAYS, AND EXCUSED ABSENCES

## ARTICLE 19
### Vacations

1. Each employee shall be entitled to vacation with pay according to their length of continuous service as follows:

| Length of Continuous Service | Vacation With Pay |
|---|---|
| After 6 months | 1 week |
| After 1 year | 2 weeks |
| After 5 years | 3 weeks |
| After 15 years | 4 weeks |
| After 23 years | 5 weeks |

Employees shall be allowed one (1) additional week of vacation beginning in the calendar year of their 63rd birthday and every year thereafter. Earned vacation may be taken by the employees during their anniversary year. This provision is not meant to contradict any other provision of this Article.

2. The primary vacation will consist of two (2) weeks and need not be consecutive.

17

3. Vacation periods of two (2) successive years may not be taken consecutively.

4. When a holiday occurs within an employee's vacation period, the Employee shall be entitled at the option of the Company to either one (1) extra day of pay or to one (1) extra day of vacation; the latter must immediately precede or follow that vacation period.

5. Days of relief immediately preceding or immediately following a vacation period are considered to be a part of that vacation period, and no employee will be called upon to work on those days of relief except in cases of emergency. A vacation period for purposes of this Article shall be no less than two (2) days. Employees will not be charged with excused overtime, for equalization of overtime purposes only, if such employees are excused from overtime assignments up until 12 midnight on the last regularly scheduled work day prior to a scheduled vacation. In the case of an employee who is working on a Monday-through-Friday maintenance-relief schedule before leaving on vacation, the Employee's days of relief for purposes of determining the Employee's vacation period will be Saturday and Sunday. Employees required to work on the days of relief immediately preceding or following a vacation period will receive double straight-time rates for all work performed on such days of relief.

6. Vacation pay under this Article shall be computed at the employee's regular straight-time rate of pay, multiplied by forty (40) for each week of vacation.

7. An employee who has actually started vacation and who is called back to work by the Company shall be paid at the rate of time and one-half for the hours

18

worked during the Employee's vacation period in addition to the Employee's regular vacation pay.

8. An employee who has made definite reservations for a vacation trip and is asked by the Company to change the Employee's vacation period will be reimbursed for any actual loss of money occasioned by the cancellation of reservations due to the change in vacation period.

9. Employee will be eligible to purchase up to one additional week of vacation to be taken in the subsequent year. All company-provided vacation will be used prior to using purchased vacation. Any unused purchased vacation time will be forfeited. All decisions to purchase vacation are irrevocable. Scheduling of the above vacation time will be in accordance with the rules governing Article 19.

10. The following will govern the scheduling of vacations:

   a. Employees who are entitled to vacations will take their vacation according to a schedule prepared by the manager of the department and subject to the provisions of this Article. A vacation application sheet will be posted each year not later than January 1, for each appropriate group of employees, upon which each employee may register their choices for primary and secondary (third, fourth, etc.) vacation weeks. The application sheet shall remain posted until February 1. There will be only one (1) posted vacation application sheet for each appropriate group, and only those sheets will be used for preparing the vacation schedule.

   b. After February 1, the application sheets will be

19

checked for conflicts, and, if any exist, seniority will then govern, except that all primary week(s) take priority over secondary week(s) regardless of seniority. The schedule will be worked out by the department manager so that it will provide coverage, make the use of relief men feasible, and give fullest possible consideration to the employee's wishes. The vacation schedule for those who registered their choice by February 1 will be posted by March 1.

c. If an employee fails to register a choice for vacation by February 1, the Employee will lose seniority rights to a choice of the vacation period, and the vacation will be assigned at such time as is available with consideration to the employee's wishes and the feasible use of relief men and provided such employee gives at least two (2) weeks' notice of the desired vacation period.

d. Any shift employee eligible for one (1) or more weeks' vacation, may split one week of vacation into five (5) parts consistent with the other provisions of this Article 19.

10. The Company reserves the right to provide relief men from whatever source available including regular full-time employees or temporary employees who may or may not be school teachers or college students.

## ARTICLE 20
### Holidays

All employees covered by this Agreement will receive compensation for eleven holidays each calendar year as follows:

20

1. Employees will receive as holiday pay eight (8) hours' pay at their regular straight-time hourly rate, whether or not they are assigned to work on any such holiday. An employee who works on a holiday which is the sixth or seventh day worked by the Employee in the payroll week will receive as holiday pay eight (8) hours' pay at one and one-half times the Employee's regular straight-time hourly rate. Whenever a holiday occurs on an employee's scheduled day off, the Employee may be assigned by the Company to celebrate such holiday on the preceding day, should such preceding day be a scheduled workday, and the Employee will receive holiday pay therefor. For day workers, when the holiday occurs on a scheduled day off, the next following scheduled workday or the next preceding scheduled workday may be assigned as the day off for the paid holiday. Any such assignment will be made in the preceding week.

2. In addition to the holiday pay to which they may be entitled under paragraph I above, all employees who are assigned to work on any such holiday, or on the day assigned to observe such holiday, will be paid for such work at time and one-half for the first eight (8) hours worked and at double time for all work in excess of eight (8) hours.

3. A holiday which occurs on a regularly scheduled workday, and for which an employee receives holiday pay, shall be counted as a day worked for the purposes of computing overtime payments. A holiday which occurs on an employee's scheduled day off and for which the Employee receives payment shall not be counted as a day worked for the purposes of computing overtime.

4. The term "holiday" as used in the Agreement means

21

the following days:

New Year's Day          Columbus Day
Washington's Birthday   Veteran's Day
Patriot's Day           Thanksgiving Day
Memorial Day            Day after Thanksgiving
Independence Day        Christmas Day
Labor Day

## ARTICLE 21
### Armed Forces Reserve Training

1. An employee who is absent for training as a Reservist in any recognized branch of the Armed Forces, without induction into active service, will receive the difference between the payment for such training and the Employee's normal five-day week's pay without overtime.

2. The Company's obligation for payments under this Article will be limited to a two weeks' training period during each calendar year for any employee. However, the sum of the employee's Armed Forces Reserve Training pay plus pay for hours worked shall not be less than the Employee's normal five-day week's pay in the calendar week preceding or following such absence due to overlapping of a shift schedule with time of departure or return.

3. An employee who is absent for such training will receive their regular vacation time in addition to the leave required for the training period.

22

## ARTICLE 22
### Jury Service

1. An employee called for Jury service will receive the difference between the payment for Jury duty and the Employee's normal five-day week's pay without overtime.

2. An employee who is serving on a Jury and who is released for a portion of the time will be expected to return to work if there will be at least three (3) hours of the Employee's scheduled work time remaining upon the Employee reporting for work and will receive payment for such work at the Employee's regular hourly rate. In the event the sum of the Employee's payment for Jury service plus the Employee's payment for hours worked are less than the Employee's normal five-day week's pay, the Employee will receive the difference between said sum and the Employee's normal five-day week's pay without overtime.

## ARTICLE 23
### Funeral Leave

1. In the event a death occurs in the immediate family of an employee, the Employee will be entitled to three days' leave with pay. Immediate family is defined as consisting of father, mother, brother, sister, wife (husband), children, father-in-law, mother-in-law, grandmother, grandfather or step-relative in the above classifications.

   a. An employee will be paid funeral leave only when the Employee is in actual attendance at the funeral and the preceding ceremonies.

   b. The employee will receive payment for funeral leave

23

only for that portion of the three days which occurs within the Employee's regularly scheduled workweek. The three days are defined as the day of the funeral and the two days preceding it. However, when a funeral occurs on Monday, the death having occurred on Friday or before, an employee will be entitled to include part or all of Friday in the three-day funeral leave. Where this definition of the days of funeral leave results in a hardship in an individual case, the period may be changed to any three consecutive days. It is expressly understood, however, that the funeral period shall include the day of the funeral service and that no change from the basic definition of the funeral period will be made solely for the purpose of bringing the funeral period within the regularly scheduled workweek.

2. Each employee, in the event death occurs to the Employee's sister-in-law, brother-in-law, aunt, uncle, niece, nephew or grandchild will be entitled to one day's leave with pay. This day will be the day of the funeral, and the employee will receive such payment only when the day occurs within the Employee's regularly scheduled workweek and only when the Employee is in actual attendance at the funeral.

a. However, when an employee attends funeral services for the Employee's sister-in-law, brother-in-law, aunt, uncle, niece, nephew, or grandchild which is held one hundred miles or more from the Employee's home, the Employee may take up to two days' leave with pay. Normally, the two days' leave will be the day of the funeral and the day following. When this results in a hardship in an

individual case, this may be changed to the day of the funeral and the preceding day. This change may not be made solely for the purpose of bringing the extra day within an employee's regularly scheduled workweek.

3. If death occurs to a member of an Employee's immediate family, as defined in this Article, during the Employee's scheduled vacation period, that portion of the Employee's scheduled vacation from the day of death up to and including the day of the funeral, but not to exceed three (3) days, will be rescheduled.

The vacation will be rescheduled at the option of the Company to another time during the calendar year. In the event the vacation to be rescheduled under this Article cannot be rescheduled during the current calendar year, it will be rescheduled as promptly as possible within the first four months of the following calendar year.

## ARTICLE 24
### Employees Called Into Military Service

1. Subject to the applicable requirements of the law, any employee who, subsequent to the enactment of the Selective Training and Service Act of 1948, left the employ of the Company to enter any of the Armed Forces of the United States of America, will retain the same seniority status that the Employee would have had if the Employee had remained in the employ of the Company during the period of the Employee's military absence, provided (a) that the Employee's military service is terminated by an honorable discharge and (b) that, within ninety (90) days after discharge, the

Employee shall apply in writing to the Company for reemployment.

2. The Company shall assign such an employee according to the Employee's seniority status providing the Employee is then qualified by fitness and ability to perform the work in the Employee's classification. If the Employee is mentally or physically unfit to perform the work in the Employee's classification, the Company shall endeavor to provide the Employee with employment in any class of work in any department of the Company for which the Company deems the Employee to be mentally, physically, and otherwise qualified. The rehired employee's total length of service with the Company, including the aforesaid military service, must always be greater than that of the employee to be displaced.

## ARTICLE 25
### Sick Leave

1. a. All employees covered by this Agreement who have been employed by the Company continuously for a period of at least one (1) year shall be allowed, during the calendar year, a total sick leave of fifteen (15) days with pay for sickness or nonoccupational accident.

b. Employees with at least ninety (90) days continuous employment shall be allowed a total sick leave of up to five (5) days with pay during the first year of continuous employment which shall not be cumulative.

c. The Company reserves the right to require that the

26

necessity for such absence from work be certified by a regular physician.

d. In addition, the employee must apply for such payment on a form supplied by the Company. In no case will any payment be made under the terms of this Section until the form has been completed and signed by the employee.

2. Each employee shall be entitled to accumulate unused sick leave as defined above up to a maximum of fifty-two (52) weeks' full pay. This accumulated sick leave may be drawn by the employee in any succeeding calendar year.

3. The maximum payment which may be received by any employee during any calendar week for sick leave or nonoccupational accidents shall not exceed straight-time payments for forty (40) hours' employment, in each case computed at the base hourly rate being paid the employee at the time said sickness or accident occurs.

## ARTICLE 26
### Occupational Accidents

1. All employees covered by this Agreement who have been employed by the Company continuously for a period of at least one (1) year, and who suffer any occupational accident as a result of which they are entitled to Workmen's Compensation benefits under the applicable law, shall be allowed the difference between the employee's normal weekly after tax wage and the Workmen's Compensation benefits for a period of not more than one (l) year. The necessity for such absence from work must be certified by a regular physician.

27

2. The total payments which may be received by the employee during each calendar year for occupational accidents shall not be greater than an amount after taxes equal to two thousand and eighty (2,080) hours' employment computed in each case at the straight-time hourly rate being paid the employee at the time said occupational accident occurs.

3. Company will notify Union of Employees who are out of work as a result of an industrial accident or illness within thirty (30) days from the date Workers' Compensation begins.

## ARTICLE 27
### Retrogression

1. If an employee with ten or more years of service with the Company becomes unable to perform the duties of the classification in which the Employee is engaged, because of advanced age or physical disability for which the Employee is not receiving Workmen's Compensation benefits, the Company may transfer the Employee to other work, if available, which the Employee is capable of performing and shall pay the Employee a rate to be determined in accordance with the paragraph below. In no event will this Article apply if the employee's disability occurs while self-employed or working for others, for renumeration.

2. Any employee with over ten (10) years of service, but less than twenty years of service so retrogressed under the previous paragraph will be paid at a special rate determined by multiplying the difference between the Employee's basic rate immediately preceding reassignment and the maximum basic rate for the lower

job classification to which the Employee is reassigned by the product of five (5) percent times the Employee's years of continuous service and adding the amount so obtained to the maximum basic rate of the lower rated job classification, but, in no case, will the special rate exceed the base rate of the classification being vacated at the time of retrogression or be less than the base rate of the new classification to which transfer is being made at the time of retrogression. For an employee with twenty or more years of continuous service there will be no reduction in the basic rate when reassigned to a lower rated job classification under this provision. In respect to fractions of a year for computing years of service, six (6) months or more will be counted as a year and less than six (6) months will be disregarded.

## BENEFIT PLANS

### ARTICLE 28
#### Health Care Plan

The employers Health Care Plan and Employee contribution schedule as described in the Company's 1994 proposal for a new Agreement will be in effect for the term of this Agreement.

### ARTICLE 29
#### Group Insurance Benefits

An employee who retires and has been enrolled in accordance with the terms of the Company's Group Life Insurance Plan will have the Employee's coverage during retirement reduced according to the provisions of the Group Life Insurance Plan and the Company will pay the necessary premiums.

## ARTICLE 30
### System Retirement Program

The Employer agrees to continue in force its present practices with respect to benefits provided under the Northeast Utilities System Retirement Plan for the term of this Agreement. It is understood and agreed that application of this employee benefit shall not be subject to grievance procedure or arbitration.

## SETTLEMENT OF DISPUTES

## ARTICLE 31
### Grievance Procedure and Arbitration

A representative of the Company and the Business Manager of the Union shall meet from time to time at the request of either party for the purpose of discussing any common problems. All such meetings shall be held at the Company's office at the convenience of both parties, if possible.

The Business Manager, Assistant Business Manager or Stewards will have reasonable freedom of movement to discuss differences which may arise in interpretation of this Agreement, investigation of grievances, or jurisdictional disputes involving the Company. The Business Manager, Assistant Business Manager or Steward will notify the Employee's supervisor, and the supervisor of any other employee involved, as far in advance as possible of the time that the Employee will be absent from work. Such freedom of movement shall not unduly interfere with Company operations.

During the term of this Agreement, should any difference, dispute, or grievance arise between the employer

30

and the Union regarding hours, wages, or working conditions or the interpretation of application of any of the provisions of the Agreement, there shall be no suspension of work and the following procedure shall be followed:

First - The aggrieved employee or employees within fifteen (15) working days after the grievance arises shall present the grievance verbally to the foreman or immediate supervisor. The foreman or immediate supervisor will endeavor to settle it by giving an answer as promptly as possible, and within five (5) working days of the date of presentation. Nothing contained in this provision shall be interpreted as preventing the Union from being present at any meeting at which any grievance is adjusted and the Union will be notified in advance of such meetings by the Company. If an answer is given and accepted by the Union in this step, the grievance shall be considered closed. If the answer is not given, or is not acceptable to the Union, the grievance may be taken to the second step within ten (10) working days from the date the answer was given or due.

Second - The Business Manager, Assistant Business Manager or Steward shall forward the grievance in writing to the manager or Superintendent concerned stating its nature and giving a brief description of the circumstances causing it. Reference shall be made to the provision(s) of the Agreement on which it may be based. The Manager or Superintendent concerned or their designated representative will investigate the grievance and the answer will be given by the Manager or Superintendent in writing within five (5) working days. If a meeting is held at this step, the answer is to be given by the Manager or Superintendent in writing five (5) working days from the date of the meeting. If the answer is not acceptable to the Union

31

or is not received within such five (5) working days, the grievance may be taken to the third step within ten (10) working days from the date that the answer was received or due. The Union may initiate the grievance at this step at any time within a period not in excess of fifteen (15) working days from the date of the alleged violation.

Third - The Business Manager, Assistant Business Manager, or Steward of the Union shall forward a copy of such written grievance to the Regional Personnel Manager. A meeting between the Regional Personnel Manager and the Business Manager or their mutually agreed to designated representative, shall be held at a time and place as agreed to by the parties. An International Representative of the I.B.E.W. may be present at this step, only to assist the local Union. The answer is to be given in writing by the Regional Personnel Manager within ten (10) working days from the date of the meeting."

Fourth - In the event that any such difference, dispute, or grievance shall not have been satisfactorily settled in the manner hereinbefore provided within thirty (30) working days after the date of the third step answer, the Union shall immediately notify the Company, in writing, that the same shall be referred for settlement to an impartial arbitrator who shall not be financially interested in the Company, to be appointed by mutual agreement of the Company and the Union. No matter shall be submitted to an impartial arbitrator after sixty-five (65) days from the date of the incident. If the Company and the Union cannot agree on the arbitrator after five (5) working days, the American Arbitration Association or the Federal Mediation and Conciliation Service shall be requested to submit a panel of five (5) arbitrators. If the Company and the Union cannot agree on an arbitrator from the list submitted by the

American Arbitration Association or the Federal Mediation and Conciliation Service, then within five (5) working days after receiving the list, either party shall request the American Arbitration Association or the Federal Mediation and Conciliation Service to name one of the persons on the list to serve as arbitrator. The arbitrator's decision or award shall be in writing and shall be final and binding on all parties. The expenses and fees incident to the services of the arbitrator shall be paid jointly by the Company and by the Union.

The impartial arbitrator shall render a decision on any difference, dispute, or grievance on the basis of the evidence, the data, and the facts properly placed before the Employee regarding such difference, dispute, or grievance.

Except as specifically provided herein this Agreement shall not be changed or added to by arbitration and all awards shall be consistent with the terms hereof.

✗ The arbitrator shall render a written decision and/or written opinion within thirty (30) days following the close of hearings.

At such times as are mutually agreeable, an aggrieved employee and the Business Manager or Assistant Business Manager of the Union will be allowed time to discuss grievances with the Company in the first and second step of this procedure without loss of pay for normal schedule work hours providing overtime replacement is not required.

# TENURE OF EMPLOYMENT

## ARTICLE 32
### Temporary Employment

The Company reserves the right to hire any employee for any classification on a temporary basis. Temporary employment is restricted to the duration of the job, for which hired, but not to exceed one (1) year. Rates of pay are to be in accordance with Schedule B attached hereto.

## ARTICLE 33
### Probationary Employment

1. The term Probationary Employee means a newly hired employee (other than a temporary employee as defined in Article 32) during the first six (6) months of continuous employment by the Company, during which period the Company will determine the suitability of such new employee for acceptance as a regular employee. If such employee is released by the Company for any reason during such period, such action will not be subject to the provisions of Article 37, Discharge of Employees, and Article 31, Grievance Procedure and Arbitration. Otherwise, the probationary employee will be covered by this Agreement and will have the full benefit of the Grievance Procedure and Arbitration.

2. A probationary employee remaining in continuous employment with the Company more than six (6) months, will automatically become a regular employee with all the rights, privileges, and responsibilities thereof.

34

## ARTICLE 34
### Substitution and Temporary Assignment

1. The Company shall have the right at any time to assign any employee as a substitute to the duties of any other employee temporarily absent by reason of sickness or any other cause, and each time while so temporarily assigned, such employee shall receive the minimum of the rate range for the employee for whom the Employee is substituting or the Employee's hourly rate of pay increased by fifteen (15) cents per hour, whichever is the higher, but not in excess of the maximum of the rate range of the classification to which the Employee is assigned. When an employee is specifically assigned by the Employee's supervisor, in advance of performance, to direct work forces normally directed by a Supervisor, the Employee will be paid 1.50 dollars per hour in addition to the Employee's basic straight-time hourly rate for all hours so assigned on that day provided the assignment is for two or more hours on that day. All employees hired prior to July 1, 1975, shall be subject to the rates as provided in Schedule A of Appendix A for all such temporary substitutions and temporary assignments.

2. a. When any employee is assigned to work as a helper to a Station Mechanic, (Station Electrician, Hydro Station Mechanic, Machinist-Maintenance mechanic, or a contractor's Maintenance man) for a total of one (1) hour or more on any day, the Employee will be paid a premium of sixteen (16) cents per hour for all time so worked, but not more than the Station Mechanic Helper S-4 classification rate.

   b. When any employee is assigned to work as a helper to a Station Mechanic (as defined in [a] above) on a

35

Mt. Tom Power Plant outage, the Employee will be paid a premium of one-half (½) the difference between the Employee's normal rate of pay (if lower) and the rate of pay of the appropriate Station Mechanic Helper's rate corresponding to the Employee's present wage step or sixteen (16) cents per hour, whichever is greater, but not more than the Station Mechanic Helper S-4 classification rate.

c. When a Fuel Handler or a Fuel and Utility Worker are assigned to work as a helper to a Station Mechanic, they will receive the appropriate Station Mechanic Helper's rate (S1-S4) corresponding to the Employee's present wage step.

d. When a Fuel Handler is temporarily assigned to work as an Equipment Operator, the Employee's rate of pay will be increased by $.50 per hour or the first rate step of Equipment Operator, whichever is more.

3. The Company will not change the normal schedule of the watch engineer (2nd Class) at Riverside in order to assign temporarily a Turbine Room 3rd Class Engineer to the duties of a watch engineer (2nd Class).

4. Company seniority shall be used to determine the order of scheduling qualified personnel from the day Fireman group for temporary assignments to shift firing for purposes of covering vacations, sickness, relief days, or absence from any other cause.

## ARTICLE 35
### Promotions

1. Vacancies which represent opportunities for promotion shall be posted for seven (7) working days and

selections will be made by the Company within fifteen (15) days from the expiration date of the posting. The Business Manager and Assistant Business Manager will be advised in writing of the selection.

2. Any employee, other than a temporary employee, having the qualifications required and desiring to be considered may apply in writing for such job within seven (7) working days after the notice is posted or such additional period as may be agreed to by the Union and the Company. The Employee shall apply by filling out an application form provided by the Company, copies of which shall be available from both the Company and the Union, and submitting the original copy of the application to the supervisor named in the notice and the duplicate copy of the application to the Business Manager or Steward of the Union. The Business Manager or Steward of the Union may submit a bid for a job on behalf of an employee who is on vacation or absent from work. The Company shall not be required to consider any employee who fails to apply as aforesaid.

3. Employees who, during the period of this Agreement, are promoted to higher classifications shall be given the wage rate of the higher classification immediately upon receiving the promotion. Selection of employees for promotion shall be made in accordance with the provisions of Article 5 and shall be based upon the following factors: length of continuous service, training, ability, efficiency, physical fitness, and residence. Whenever all factors are relatively equal, length of continuous service shall govern.

4. Employees in the classification of Assistant Meter and Instrument Technician are to be upgraded to the

classification of Meter and Instrument Technician without job posting after completing the step requirements listed under Schedule B.

5. First opportunity to fill a vacancy in the classification of Lead Equipment Operator shall be given to qualified employees in the classification of Equipment Operator. Such selection shall be made without job posting and shall be in accordance with the provisions of paragraph 3.

6. Under this Article, any employee bidding into or newly hired into Fossil and Hydro Operations Department job vacancies titled Utility Worker - Mt. Tom Station and Operators Assistant - Gatehouse/Boatlock shall not be eligible to bid another job until expiration of twenty-four (24) months from the date of selection. Exception to this twenty-four (24) month restriction shall be job posting opportunities within the HWPCO's Fossil Hydro Operations group. Any employee bidding into or newly hired into job vacancies other than the Operations Department positions described above shall not be eligible to bid another position until expiration of six (6) months from the date of selection.

7. Vacancies occurring in the bargaining unit shall be posted for seven (7) working days prior to being filled by employees who are entitled to recall.

## ARTICLE 36
### Notice of Leaving by Employee

An employee who has had six (6) months or more of continuous service shall give the Company at least one (1) week's notice before terminating the Employee's

38

employment. An employee who does not give at least one (1) week's notice before terminating their employment shall forfeit their rights to any accrued vacation pay.

## ARTICLE 37
### Discharge of Employees

1. Upon discharge or suspension of an employee, the Union may request a meeting with the Company to discuss such discharge or suspension. The request must:

   a. Be in writing.

   b. Be received by the Company within seven (7) days from the date of the discharge or suspension.

   c. Include the reasons for believing the discharge or suspension to be improper.

2. Upon receipt of the above request, the Company will:

   a. Set a date for the meeting with the Union and the discharged or suspended employee, which must be within five (5) days after receipt of the request from the Union.

   b. Inform the Union of the reason for the discharge or suspension.

3. The Company will state its determination within two (2) days subsequent to the conference. If the Company determines that the employee was not properly suspended or discharged, the employee will be reinstated without prejudice and may be compensated by the Company for the loss of wages

39

as hereinafter stated.

4. If the employee is not satisfied with the determination of the Company, the Union may make a written request within five (5) days after such determination that the matter of the discharge or suspension of such employee be referred for settlement to arbitration under the provisions of Article 31.

5. The Arbitrator shall have the power to make a decision determining whether or not the discharge or suspension was proper hereunder, and, if improper, whether or not to order the employee reinstated with back pay.

6. An award of back pay made by either the Company or the Arbitrator shall be the number of hours that the employee would have worked had the Employee been employed, computed on an eight (8) hour day at normal rates. The award shall be limited to payment for a maximum period extending from the date of discharge or suspension to the date twenty (20) working eight (8) hour days after the date the arbitrator is notified of being selected.

7. No employee covered by this Agreement who has been employed by the Company continuously for a period of at least one (1) year shall be discharged for any reason whatsoever without one (1) week's notice or the payment of one (1) week's normal wage at the time of such discharge.

## ARTICLE 38
### Reduction in Forces

1. In the event jobs are eliminated by automation or other reasons, or there is a reduction in forces, there will first be discussion with the Union, and the employees

40

affected will be offered the opportunity to take another job for which they are best qualified, displacing employees with less seniority. The employees so displaced, will, in turn, be offered the same opportunity on the same basis. Efforts will be made to keep such bumping to a minimum, while, at the same time, recognizing the employee's desires for a job with as little difference in rate as may be available.

2. If the employee has more than ten (10) years of service, but less than twenty (20) years of service, and the rate of the job to which the Employee is assigned is lower than the Employee's previous regular rate, the Employee will receive a special rate determined in the same manner as the special rate in paragraph 2 of Article 27; for an employee with twenty (20) or more years of continuous service, there will be no reduction in basic rate when reassigned to a lower-rated job classification.

3. Effective July 1, 1975, any employee with ten or more years of continuous service will not be laid off during the term of this Agreement because of a reduction or change in the work force.

4. Employees who are laid off will be entitled to recall for a period of two years from the date of layoff. Employees who are entitled to recall will be called back in reverse order to the layoff, provided they are available, able and qualified to perform the available work, accept the offered job and return to work within two weeks. A registered letter to the employee's last known address will be considered recall for the purpose of this Section. In the event an employee who is recalled is unable to return to work within two weeks because of physical disability of temporary nature, the Employee will be

41

given the next available recall within the Employee's recall period.

If an employee, who has completed one or more years of continuous service, is not offered a job, the employee shall be given an allowance of 40 hours pay at the employee's straight-time hourly rate for each full year of continuous service with the Company. For any such employee who is 50 years or more of age, the above-mentioned allowance will, instead of 40 hours, be 60 hours if the employee has completed at least 15 years of continuous service or 80 hours if the employee has completed at least 25 years of continuous service. Any furloughed employee or employee identified to be furloughed, who obtains employment with any of the system companies, and Connecticut Yankee Atomic Power Company, will not be entitled to terminal pay. Any such employee who accepts terminal pay will thereby relinquish all other rights, other than vested rights, under this Agreement and will not be eligible for recall.

Any employee who accepts any position or who is offered a position similar to the position the employee held with the Company prior to the sale or lease, in which the employee has experience, the wages and benefits for which are reasonably comparable to those earned prior to such sale or lease with this Company, or with the purchaser or lessor, shall not be eligible for severance pay.

## GENERAL PROVISIONS

### ARTICLE 39
### Notice and Requests for Meeting

All notices and requests for meetings, and the like, shall

42

be deemed to have been fully served by the Company when sent by registered mail to the Business Manager of Local 455 or such other representative of the Local as the Company has been advised in writing by the Local as the person to receive notices; and by the Union when sent by registered mail to the Company at No. 1 Canal Street, Holyoke, Massachusetts, unless either party hereto shall give notice of a change in the above at least five (5) days before any such notice.

### ARTICLE 40
### Construction and Limitations

1. No representations, agreements, inducements, or warranties are made by either party except as set forth herein.

2. This Agreement shall be construed as a whole, and no provision hereof shall be construed to be paramount to any other provision hereof which may be claimed to be in conflict with it, but all parts of this Agreement shall be construed to be of equal importance.

## DURATION AND RENEWAL OF AGREEMENT

### ARTICLE 41
### Term of Agreement

1. This Agreement shall take effect as of 12 o'clock noon of October 1, 2001, and shall remain in effect until 12 o'clock noon of October 1, 2004, subject to the provisions of paragraph 2 hereof. It shall continue in effect from year to year thereafter from October 1 to October 1 of each year, unless changed or terminated as hereafter provided.

43

2. Either party desiring to change or terminate this Agreement must notify the other in writing at least sixty (60) days prior to October 1, 2004, or sixty (60) days prior to October 1 of any year thereafter during the life of this Agreement.

3. Nothing in this Agreement shall be construed as an Agreement to submit to arbitration any changes in this Agreement proposed in accordance with the foregoing provisions.

4. If any provision of this Agreement should become invalid hereafter by reason of any change of law which is applicable thereto, and provided that such change of law is effective to change this Agreement without violation of the obligation of contract, then this Agreement shall be modified only to such extent as is required by such law and shall otherwise be and remain in full force and effect.

44

---

IN WITNESS WHEREOF the Company and the Union have executed this Agreement by their authorized representatives the day and year first above written.

**Northeast Generation Services**
**Mt. Tom Station**

By _____
Dennis R. Brown  5-31-02

**LOCAL 455 OF THE INTERNATIONAL**
**BROTHERHOOD OF**
**ELECTRICAL WORKERS**

Witness _____

By _____
Brian E. Kenney,
President

Witness _____

By _____
William H. O'Rourke
Business Manager

Witness _____

_____

_____

_____

**Union Negotiating Committee**

APPROVED:

International Office - I.B.E.W.

John J. Barry, President

APPROVED
INTERNATIONAL OFFICE - I.B.E.W.

JUN 1 2 2002

45

# MT. TOM STATION
## APPENDIX A - SCHEDULE A
### CLASSIFICATION LIST AND SCHEDULE OF WAGES
### PRODUCTION DEPARTMENT

Effective
09/30/01

**MT. TOM POWER PLANT**

| | |
|---|---|
| Relief Control Room Engineer (2E) | $30.12 |
| Control Room Engineer (2E) | $30.12 |
| Utility Operator (1F) | $24.54 |
| Assistant Utility Operator (2F) | $22.07 |
| Utility Worker | $19.42 |
| Instrument Specialist | $29.29 |
| Instrument Technician | $28.01 |
| Station Electrician | $26.76 |
| Station Serviceperson | $23.14 |
| Station Mechanic | $26.76 |
| ***Station Mechanic - MSW | $27.02 |
| ****Station Mechanic - HSMO | $27.26 |
| *****Station Mechanic - HSMO (MSW) | $27.52 |
| ** Area Stockhandler | $24.23 |
| Stockhandler-Station Serviceperson | $23.19 |

**COBBLE MOUNTAIN**

| | |
|---|---|
| *Hydro Station Maintenance Operator | $26.76 |

All employees hired after July 1, 1975 shall be subject to the provisions and rates as provided in Schedule B of Appendix A for all assignments.

Employees in Operating classifications who may, by proper procedure, be assigned to work normally and regularly in more than one classification and who work in a total of

46

three or more classifications, two of which are shift work, shall be classified in the highest classification in which they are normally and regularly assigned.

\* Rules applicable per letter dated 2/28/98 regarding bumping/seniority rights apply to the incumbents as of the date of the above-mentioned letter.

\*\* Classifications to be deleted -- incumbents grandfathered.

\*\*\* A one-time additional $0.25 is included in this rate in accordance with the Multi-Skilled Worker Agreement prior to the general increase effective 10/01/01.

\*\*\*\* This rate reflects an additional $0.50 added to the Station Mechanic base rate after each subsequent general wage increase.

\*\*\*\*\* This rate reflects an additional $0.50 added to the Station Mechanic (MSW) after each subsequent general wage increase.

47

# MT. TOM STATION
## Appendix A - Schedule B
## Classification List and Schedule of Wages -
Effective September 30, 2001

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| PRODUCTION DEPARTMENT | | | | | | | | | |
| MT. TOM POWER PLANT | | | | | | | | | |
| Relief Control Room Engineer (2E) | $28.94 | $29.49 | $30.12 | | | | | | |
| Control Room Engineer (2E) | $28.94 | $29.49 | $30.12 | | | | | | |
| Utility Operator (1F) | $24.54 | | | | | | | | |
| Assistant Utility Operator (2F) | $20.72 | $22.07 | | | | | | | |
| Utility Worker | $17.25 | $17.84 | $18.60 | $19.42 | | | | | |
| Instrument Technician | $26.23 | $26.82 | $27.45 | $28.01 | | | | | |
| Station Electrician | $18.20 | $19.22 | $20.22 | $21.16 | $22.67 | $23.25 | $24.26 | $24.79 | $26.76 |
| Station Serviceperson | $18.07 | $18.87 | $19.67 | $20.54 | $20.90 | $22.07 | $23.14 | | |
| Station Mechanic | $18.02 | $19.22 | $20.22 | $21.16 | $22.67 | $23.25 | $24.26 | $24.79 | $27.02 |
| ***Station Mechanic - MSW | $27.02 | | | | | | | | |
| ****Station Mechanic - HSMO | $27.26 | | | | | | | | |
| *****Station Mechanic - HSMO (MSW) | $27.52 | | | | | | | | |
| **Area Stockhandler | $24.23 | | | | | | | | |
| Instrument Specialist | $29.29 | | | | | | | | |
| Stockhandler-Station Serviceperson | $14.89 | $16.33 | $17.30 | $18.18 | $19.88 | $20.99 | $21.62 | $23.19 | |
| COBBLE MOUNTAIN | | | | | | | | | |
| *Hydro Station Maintenance Operator | $18.20 | $19.22 | $20.22 | $21.16 | $22.67 | $23.25 | $24.26 | $24.79 | $26.76 |

All employees hired after July 1, 1975, shall be subject to the provisions and rates as provided in Schedule B of Appendix A for all assignments.

Employees in operating classifications who may, by proper procedure, be assigned to work normally and regularly in more than one classification and who work in a total of three or more classifications, two of which are shift work, shall be classified in the highest classification in which they are normally and regularly assigned.

* Rules applicable per letter dated 2/28/98 regarding bumping/seniority rights apply to the incumbents as of the date of the above-mentioned letter.

** Classification to be deleted – incumbents grandfathered

*** A one-time additional $0.25 is included in this rate in accordance with the Multi-Skilled Worker Agreement prior to the general increase effective 10/01/01 and is included in the base rate thereafter.

**** This rate reflects an additional $0.50 added to the Station Mechanic base rate after each subsequent general wage increase.

***** This rate reflects an additional $0.50 added to the Station Mechanic (MSW) base rate after each subsequent general wage increase.

## MT. TOM STATION
### HYDRO STATION MAINTENANCE OPERATOR
### TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 30, 2001

|           | Title                                        | $       |
|-----------|----------------------------------------------|---------|
| Star      | Hydro Station Maintenance Operator S1        | $18.20  |
| 6 Months  | Hydro Station Maintenance Operator S2        | $19.22  |
| 12 Months | Hydro Station Maintenance Operator S3        | $20.22  |
| 18 Months | Hydro Station Maintenance Operator S4        | $21.16  |
| 24 Months | Hydro Station Maintenance Operator S5        | $22.67  |
| 30 Months | Hydro Station Maintenance Operator S6        | $23.25  |
| 36 Months | Hydro Station Maintenance Operator S7        | $24.26  |
| 42 Months | Hydro Station Maintenance Operator          | $24.79  |
| 48 Months | Hydro Station Maintenance Operator          | $26.76  |

50

## MT. TOM STATION
### STATION ELECTRICIAN TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 30, 2001

|           | Title                          | $       |
|-----------|--------------------------------|---------|
| Start     | Station Electrician Helper S1  | $18.20  |
| 6 Months  | Station Electrician Helper S2  | $19.22  |
| 12 Months | Station Electrician Helper S3  | $20.22  |
| 18 Months | Station Electrician Helper S4  | $21.16  |
| 24 Months | Station Electrician Helper S5  | $22.67  |
| 30 Months | Station Electrician Helper S6  | $23.25  |
| 36 Months | Station Electrician Helper S7  | $24.26  |
| 42 Months | Station Electrician Helper S8  | $24.79  |
| 48 Months | Station Electrician            | $26.76  |

## MT. TOM STATION
### STATION MECHANIC TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 30, 2001

|           | Title                        | $       |
|-----------|------------------------------|---------|
| Start     | Station Mechanic Helper S1   | $18.20  |
| 6 Months  | Station Mechanic Helper S2   | $19.22  |
| 12 Months | Station Mechanic Helper S3   | $20.22  |
| 18 Months | Station Mechanic Helper S4   | $21.16  |
| 24 Months | Station Mechanic Helper S5   | $22.67  |
| 30 Months | Station Mechanic Helper S6   | $23.25  |
| 36 Months | Station Mechanic Helper S7   | $24.26  |
| 42 Months | Station Mechanic             | $24.79  |
| 48 Months | Station Mechanic             | $26.76  |

51

**MT. TOM STATION**
**STOCKHANDLER-STATION SERVICEPERSON**
**TIME MERIT PROGRESSION**

RATES EFFECTIVE SEPTEMBER 30, 2001

| | Title | $ |
|---|---|---|
| Start | Stockhandler-Station Serviceperson Helper S1 | $14.89 |
| 6 Months | Stockhandler-Station Serviceperson Helper S2 | $16.33 |
| 12 Months | Stockhandler-Station Serviceperson Helper S3 | $17.30 |
| 18 Months | Stockhandler-Station Serviceperson Helper S4 | $18.18 |
| 24 Months | Stockhandler-Station Serviceperson Helper S5 | $19.88 |
| 30 Months | Stockhandler-Station Serviceperson Helper S6 | $20.99 |
| 36 Months | Stockhandler-Station Serviceperson Helper S7 | $21.62 |
| 42 Months | Stockhandler-Station Serviceperson | $23.19 |

52

---

**MT. TOM STATION**
**APPENDIX A - SCHEDULE A**
**CLASSIFICATION LIST AND SCHEDULE OF WAGES**
**PRODUCTION DEPARTMENT**

| | Effective 09/29/2002 |
|---|---|
| **MT. TOM POWER PLANT** | |
| Relief Control Room Engineer (2E) | $31.02 |
| Control Room Engineer (2E) | $31.02 |
| Utility Operator (1F) | $25.28 |
| Assistant Utility Operator (2F) | $22.73 |
| Utility Worker | $20.00 |
| Instrument Specialist | $30.17 |
| Instrument Technician | $28.85 |
| Station Electrician | $27.56 |
| Station Serviceperson | $23.83 |
| Station Mechanic | $27.56 |
| ***Station Mechanic (MSW) | $27.83 |
| ****Station Mechanic - HSMO | $28.06 |
| *****Station Mechanic - HSMO (MSW) | $28.33 |
| ** Area Stockhandler | $24.96 |
| Stockhandler-Station Serviceperson | $23.89 |
| | |
| **COBBLE MOUNTAIN** | |
| *Hydro Station Maintenance Operator | $27.56 |

All employees hired after July 1, 1975 shall be subject to the provisions and rates as provided in Schedule B of

53

Appendix A for all assignments.

Employees in Operating classifications who may, by proper procedure, be assigned to work normally and regularly in more than one classification and who work in a total of three or more classifications, two of which are shift work, shall be classified in the highest classification in which they are normally and regularly assigned.

* Rules applicable per letter dated 2/28/98 regarding bumping/seniority rights apply to the incumbents as of the date of the above-mentioned letter.

** Classifications to be deleted – incumbents grandfathered.

*** A one-time additional $0.25 is included in this rate in accordance with the Multi-Skilled Worker Agreement prior to the general increase effective 10/01/01.

**** This rate reflects an additional $0.50 added to the Station Mechanic base rate after each subsequent general wage increase.

***** This rate reflects an additional $0.50 added to the Station Mechanic (MSW) base rate after each subsequent general wage increase.

**MT. TOM STATION**
**Appendix A - Schedule B**
**Classification List and Schedule of Wages -**
Effective September 29, 2002

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| PRODUCTION DEPARTMENT | | | | | | | | | |
| MT. TOM POWER PLANT | | | | | | | | | |
| Relief Control Room Engineer (2E) | $29.81 | $30.37 | $31.02 | | | | | | |
| Control Room Engineer (2E) | $29.81 | $30.37 | $31.02 | | | | | | |
| Utility Operator (1F) | $25.28 | | | | | | | | |
| Assistant Utility Operator (2F) | $21.34 | $22.73 | | | | | | | |
| Utility Worker | $17.77 | $18.38 | $19.16 | $20.00 | | | | | |
| Instrument Technician | $27.02 | $27.62 | $28.27 | $28.85 | | | | | |
| Station Electrician | $18.75 | $19.80 | $20.83 | $21.79 | $23.35 | $23.95 | $24.99 | $25.53 | $27.56 |
| Station Serviceperson | $18.60 | $19.44 | $20.26 | $21.16 | $21.53 | $22.73 | $23.83 | | |
| Station Mechanic | $18.75 | $19.80 | $20.83 | $21.79 | $23.35 | $23.95 | $24.99 | $25.53 | $27.56 |
| ***Station Mechanic - MSW | $27.83 | | | | | | | | |
| ****Station Mechanic - HSMO | $28.06 | | | | | | | | |
| *****Station Mechanic - HSMO (MSW) | $28.33 | | | | | | | | |
| **Area Stockhandler | $24.46 | $24.96 | | | | | | | |
| Instrument Specialist | $30.17 | | | | | | | | |
| Stockhandler-Station Serviceperson | $15.34 | $16.82 | $17.82 | $18.73 | $20.48 | $21.62 | $22.27 | $23.89 | |

All employees hired after July 1, 1975, shall be subject to the provisions and rates as provided in Schedule B of Appendix A for all assignments.

**MT. TOM STATION**
**HYDRO STATION MAINTENANCE OPERATOR**
**TIME METER PROGRESSION**
RATES EFFECTIVE SEPTEMBER 29, 2002

| | Title | $ |
|---|---|---|
| Start | Hydro Station Maintenance Operator Helper S1 | $18.75 |
| 6 Months | Hydro Station Maintenance Operator Helper S2 | $19.80 |
| 12 Months | Hydro Station Maintenance Operator Helper S3 | $20.83 |
| 18 Months | Hydro Station Maintenance Operator Helper S4 | $21.79 |
| 24 Months | Hydro Station Maintenance Operator Helper S5 | $23.35 |
| 30 Months | Hydro Station Maintenance Operator Helper S6 | $23.95 |
| 36 Months | Hydro Station Maintenance Operator Helper S7 | $24.99 |
| 42 Months | Hydro Station Maintenance Operator | $25.53 |
| 48 Months | Hydro Station Maintenance Operator | $27.56 |

57

Employees in operating classifications who may, by proper procedure, be assigned to work normally and regularly in more than one classification and who work in a total of three or more classifications, two of which are shift work, shall be classified in the highest classification in which they are normally and regularly assigned.

- Rules applicable per letter dated 2/28/98 regarding bumping/seniority rights apply to the incumbents as of the date of the above-mentioned letter.
- ** Classification to be deleted – incumbents grandfathered
- *** A one-time additional $0.25 is included in this rate in accordance with the Multi-Skilled Worker Agreement prior to the general increase, effective 10/01/01.
- **** This rate reflects an additional $0.50 added to the Station Mechanic base rate after each subsequent general wage increase.
- ***** This rate reflects an additional $0.50 added to the Station Mechanic (MSW) base rate after each subsequent general wage increase.

56

## MT. TOM STATION
### STATION ELECTRICIAN TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 29, 2002

| | Title | $ |
|---|---|---|
| Start | Station Electrician Helper S1 | $18.75 |
| 6 Months | Station Electrician Helper S2 | $19.80 |
| 12 Months | Station Electrician Helper S3 | $20.83 |
| 18 Months | Station Electrician Helper S4 | $21.79 |
| 24 Months | Station Electrician Helper S5 | $23.35 |
| 30 Months | Station Electrician Helper S6 | $23.95 |
| 36 Months | Station Electrician Helper S7 | $24.99 |
| 42 Months | Station Electrician Helper S8 | $25.53 |
| 48 Months | Station Electrician | $27.56 |

## MT. TOM STATION
### STATION MECHANIC TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 29, 2002

| | Title | $ |
|---|---|---|
| Start | Station Mechanic Helper S1 | $18.75 |
| 6 Months | Station Mechanic Helper S2 | $19.80 |
| 12 Months | Station Mechanic Helper S3 | $20.83 |
| 18 Months | Station Mechanic Helper S4 | $21.79 |
| 24 Months | Station Mechanic Helper S5 | $23.35 |
| 30 Months | Station Mechanic Helper S6 | $23.95 |
| 36 Months | Station Mechanic Helper S7 | $24.99 |
| 42 Months | Station Mechanic | $25.53 |
| 48 Months | Station Mechanic | $27.56 |

58

## MT. TOM STATION
### STOCKHANDLER-STATION SERVICEPERSON
### TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 29, 2002

| | Title | $ |
|---|---|---|
| Start | Stockhandler-Station Serviceperson Helper S1 | $15.34 |
| 6 Months | Stockhandler-Station Serviceperson Helper S2 | $16.82 |
| 12 Months | Stockhandler-Station Serviceperson Helper S3 | $17.82 |
| 18 Months | Stockhandler-Station Serviceperson Helper S4 | $18.73 |
| 24 Months | Stockhandler-Station Serviceperson Helper S5 | $20.48 |
| 30 Months | Stockhandler-Station Serviceperson Helper S6 | $21.62 |
| 36 Months | Stockhandler-Station Serviceperson Helper S7 | $22.27 |
| 42 Months | Stockhandler-Station Serviceperson | $23.89 |

59

shall be classified in the highest classification in which they are normally and regularly assigned.

\* Rules applicable per letter dated 2/28/98 regarding bumping/seniority rights apply to the incumbents as of the date of the above-mentioned letter.

\*\* Classifications to be deleted – incumbents grandfathered.

\*\*\* A one-time additional $0.25 is included in this rate in accordance with the Multi-Skilled Worker Agreement prior to the general increase effective 10/01/01.

\*\*\*\* This rate reflects an additional $0.50 added to the Station Mechanic base rate after each subsequent general wage increase.

\*\*\*\*\* This rate reflects an additional $0.50 added to the Station Mechanic (MSW) base rate after each subsequent general wage increase.

61

---

## MT. TOM STATION
### APPENDIX A - SCHEDULE A
### CLASSIFICATION LIST AND SCHEDULE OF WAGES
### PRODUCTION DEPARTMENT

Effective
09/28/2003

**MT. TOM POWER PLANT**

| Classification | Rate |
|---|---|
| Relief Control Room Engineer (2E) | $31.95 |
| Control Room Engineer (2E) | $31.95 |
| Utility Operator (1F) | $26.04 |
| Assistant Utility Operator (2F) | $23.41 |
| Utility Worker | $20.60 |
| Instrument Specialist | $31.08 |
| Instrument Technician | $29.72 |
| Station Electrician | $28.39 |
| Station Serviceperson | $24.54 |
| Station Mechanic | $28.66 |
| \*\*\*Station Mechanic (MSW) | $28.39 |
| \*\*\*Station Mechanic - HSMO | $29.20 |
| \*\*\*\*\*Station Mechanic - HSMO (MSW) | $29.16 |
| \*\* Area Stockhandler | $25.71 |
| Stockhandler-Station Serviceperson | $24.61 |

**COBBLE MOUNTAIN**

| | |
|---|---|
| \*Hydro Station Maintenance Operator | $28.39 |

All employees hired after July 1, 1975 shall be subject to the provisions and rates as provided in Schedule B of Appendix A for all assignments.

Employees in Operating classifications who may, by proper procedure, be assigned to work normally and regularly in a total of more than one classification and who work in a total of three or more classifications, two of which are shift work,

60

## MT. TOM STATION
### Appendix A - Schedule B
**Classification List and Schedule of Wages -**
Effective September 28, 2003

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| **PRODUCTION DEPARTMENT** | | | | | | | | | |
| **MT. TOM POWER PLANT** | | | | | | | | | |
| Relief Control Room Engineer (2E) | $30.70 | $31.28 | $31.95 | | | | | | |
| Control Room Engineer (2E) | $30.70 | $31.28 | $31.95 | | | | | | |
| Utility Operator (1F) | $26.04 | | | | | | | | |
| Assistant Utility Operator (2F) | $21.98 | | | | | | | | |
| Utility Worker | $18.30 | $18.93 | $19.73 | $20.60 | | | | | |
| Instrument Technician | $28.39 | | | | | | | | |
| Station Electrician | $27.83 | $28.45 | $29.12 | $29.72 | | | | | |
| Station Serviceperson | $26.30 | | | | | | | | |
| Station Mechanic | $19.17 | $20.02 | $20.87 | $21.79 | $22.18 | $23.41 | $24.54 | | |
| ***Station Mechanic (MSW) | $19.31 | $20.39 | $21.45 | $22.44 | $24.05 | $24.67 | $25.74 | $26.30 | $28.39 |
| ****Station Mechanic - HSMO (MSW) | $28.68 | | | | | | | | |
| Station Mechanic - HSMO | $28.89 | | | | | | | | |
| | $29.16 | | | | | | | | |
| *Area Stockhandler | $25.71 | | | | | | | | |
| Instrument Specialist | $25.19 | | | | | | | | |
| | $31.08 | | | | | | | | |
| Stockhandler-Station Serviceperson | $15.80 | $17.32 | $18.35 | $19.29 | $21.09 | $22.27 | $22.94 | $24.61 | |
| **COBBLE MOUNTAIN** | | | | | | | | | |
| *Hydro Station Maintenance Operator | $28.39 | | | | | | | | |

All employees hired after July 1, 1975, shall be subject to the provisions and rates as provided in Schedule B of Appendix A for all assignments.

Employees in operating classifications who may, by proper procedure, be assigned to work normally and regularly in more than one classification and who work in a total of three or more classifications, two of which are shift work, shall be classified in the highest classification in which they are normally and regularly assigned.

- Rules applicable per letter dated 2/28/98 regarding bumping/seniority rights apply to the incumbents as of the date of the above-mentioned letter.
- ** Classification to be deleted - Incumbents grandfathered.
- *** A one-time additional $0.25 is included in this rate in accordance with the Multi-Skilled Worker Agreement prior to the general increase effective 10/01/01.
- **** This rate reflects an additional $0.50 added to the Station Mechanic base rate after each subsequent general wage increase.
- ***** This rate reflects an additional $0.50 added to the Station Mechanic (MSW) base rate after each subsequent general wage increase.

## MT. TOM STATION
## HYDRO STATION MAINTENANCE OPERATOR
## TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 28, 2003

| | Title | $ |
|---|---|---|
| Start | Hydro Station Maintenance Operator Helper S1 | $19.31 |
| 6 Months | Hydro Station Maintenance Operator Helper S2 | $20.39 |
| 12 Months | Hydro Station Maintenance Operator Helper S3 | $21.45 |
| 18 Months | Hydro Station Maintenance Operator Helper S4 | $22.44 |
| 24 Months | Hydro Station Maintenance Operator Helper S5 | $24.05 |
| 30 Months | Hydro Station Maintenance Operator Helper S6 | $24.67 |
| 36 Months | Hydro Station Maintenance Operator Helper S7 | $25.74 |
| 42 Months | Hydro Station Maintenance Operator Helper S8 | $26.30 |
| 48 Months | Hydro Station Maintenance Operator | $28.39 |

64

## MT. TOM STATION
## STATION ELECTRICIAN TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 28, 2003

| | Title | $ |
|---|---|---|
| Start | Station Electrician Helper S1 | $19.31 |
| 6 Months | Station Electrician Helper S2 | $20.39 |
| 12 Months | Station Electrician Helper S3 | $21.45 |
| 18 Months | Station Electrician Helper S4 | $22.44 |
| 24 Months | Station Electrician Helper S5 | $24.05 |
| 30 Months | Station Electrician Helper S6 | $24.67 |
| 36 Months | Station Electrician Helper S7 | $25.74 |
| 42 Months | Station Electrician Helper S8 | $26.30 |
| 48 Months | Station Electrician | $28.39 |

## MT. TOM STATION
## STATION MECHANIC TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 28, 2003

| | Title | $ |
|---|---|---|
| Start | Station Mechanic Helper S1 | $19.31 |
| 6 Months | Station Mechanic Helper S2 | $20.39 |
| 12 Months | Station Mechanic Helper S3 | $21.45 |
| 18 Months | Station Mechanic Helper S4 | $22.44 |
| 24 Months | Station Mechanic Helper S5 | $24.05 |
| 30 Months | Station Mechanic Helper S6 | $24.67 |
| 36 Months | Station Mechanic Helper S7 | $25.74 |
| 42 Months | Station Mechanic | $26.30 |
| 48 Months | Station Mechanic | $28.39 |

65

## MT. TOM STATION
## STOCKHANDLER-STATION SERVICEPERSON
## TIME MERIT PROGRESSION
RATES EFFECTIVE SEPTEMBER 28, 2003

| | Title | $ |
|---|---|---|
| Start | Stockhandler Helper S1 | $15.80 |
| 6 Months | Stockhandler Helper S2 | $17.32 |
| 12 Months | Stockhandler Helper S3 | $18.35 |
| 18 Months | Stockhandler Helper S4 | $19.29 |
| 24 Months | Stockhandler Helper S5 | $21.09 |
| 30 Months | Stockhandler Helper S6 | $22.27 |
| 36 Months | Stockhandler Helper S7 | $22.94 |
| 42 Months | Stockhandler | $24.61 |

## APPENDIX B
## NORTHEAST GENERATION SERVICES

I hereby authorize and direct you to deduct from my pay union membership dues in the amount fixed in accordance with the constitution and bylaws of Local 455 of the International Brotherhood of Electrical Workers and to pay the same to said local Union in accordance with the terms of the Agreement between it and the Company.

This authorization and direction shall be irrevocable for a period of one year or until the termination date of the present Agreement, whichever occurs sooner, and I agree and direct that this authorization and direction shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable Agreement between the Company and the Union, whichever shall be shorter, unless written notice is given by registered mail by me to the Company and the Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one year, or of each applicable Agreement between the Company and the Union, whichever occurs sooner.



July 1, 1970

Mr. Michael J. Stevens
Business Manager, Local 926
International Brotherhood of Electrical Workers
Holyoke, Massachusetts 01040

Dear Mr. Stevens:

This will confirm the Company's statement during recent negotiations to the effect that, in addition to the leave for two weeks' armed forces reserve training as provided in Article 21 of the collective bargaining agreement, if an employee is required to report for active duty by the National Guard or reserve component of the armed forces in the event of civil disturbance or natural disaster, the Employee will receive the difference between the payment for such military duty and the Employee's normal straight-time pay without overtime, for each work day lost up to an additional maximum of five work days.

Very truly yours,

Ralph E. Day
Treasurer

RED:dmh

72

---

July 1, 1973

Mr. Michael J. Stevens
President, Local 455
International Brotherhood of Electrical Workers
Holyoke, Massachusetts 01040

Dear Mr. Stevens:

This will confirm the Company's agreement during the recent negotiations pertaining to Illness or Injury Immediately Preceding or During Scheduled Vacation.

An employee who has been unable to take all of their vacation by December 31 due to a verified incapacitating illness, will have their incapacitated vacation time, up to eighty (80) hours extended until December 31 of the following year, scheduled at the option of the employer. The eighty (80) hour restriction does not apply to vacation employees are unable to take due to Company operating requirements.

Very truly yours,

Frank P. Ittner, Jr.
Assistant Manager

FPIJr:gc

73

July 1, 1976

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local 455
145 State Street, Room 416
Springfield, Massachusetts 01103

Dear Mr. Collins:

This will confirm the Company's agreement during the recent negotiations pertaining to triple-indemnity life insurance.

In the event any employee suffers loss of life as a result of a job-connected injury, and benefits are payable under the terms of Accidental Death and Dismemberment, the Company will pay an additional benefit equal to the amount payable under the Policy."

Very truly yours,

Donald E. Riga
Manager of Personnel

DER:v

74

---

July 1, 1976

## MEMORANDUM
## HOLYOKE WATER POWER COMPANY
## EMPLOYEES' SAFETY COMMITTEE

A. There shall be an Employee Safety Committee whose duties shall be to meet monthly on a prearranged schedule to review current accidents and safety problems and to offer recommendations for improvements in safety.

B. The Employees' Safety Committee shall be composed of the Safety Supervisor or the Employee's representative and a membership selected from all the employees of the Company.

The Union shall select a total of six employees to attend such committee meetings and shall advise the Company in advance of each meeting as to who has been selected.

C. The Safety Committee shall elect a chairman and a secretary to serve for the period of rotation of the members of the committee. It shall be the duty of the secretary to keep the minutes of the meetings and arrange to have the minutes typed or reproduced with sufficient copies for distribution as requested by the committee.

D. Members who have been selected by the Union to serve on the Safety Committee and who attend a scheduled committee meeting which is held at a location other than their regular working location will be entitled to transportation from their regular stations to the location where the meeting is being held and return to their regular stations. If such transportation cannot be furnished by the Company, the supervisor will approve mileage to the employee's own vehicle, such mileage being paid in accordance with the Company mileage allowance policy.

Donald E. Riga
Manager of Personnel
Holyoke Water Power Company

75

July 28, 1982

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local #455
655 Page Boulevard, Room 213
Springfield, Mass. 01104

Dear Mr. Collins:

The following understanding was reached between the Company and the Union concerning the application of Article 12, Rest Period.

It was agreed that for all work during the annual overhaul at Mt. Tom Station and the scheduled overhaul of major equipment on the Holyoke Hydro-Chicopee River System, including the annual canal outage, that paragraph 2 would be amended to read:

An employee called in for maintenance or yard work for more than one hour.

Northfield Mountain overhauls are specifically deleted from this modification of Article 12.

Will you please sign one copy of this letter acknowledging your agreement with this understanding and return it to me.

Sincerely,

HOLYOKE WATER POWER COMPANY

Donald E. Riga
Regional Personnel Manager

Approved:

Business Manager, IBEW Local #455

76

---

174 Brush Hill Avenue
West Springfield, Mass. 01089
July 19, 1976

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local #455
145 State Street, Room 416
Springfield, Mass. 01103

Dear Mr. Collins:

In the Company and Union 1976 negotiations leading to a new agreement, the subject of the Appliance Purchase Program was discussed. While both parties reserved their rights without prejudice, on the matter of the Appliance Purchase Program for the period prior to July 1, 1976, it was agreed that effective July 1, 1976, the Appliance Purchase Program does not exist as a condition of employment, as a matter of contract, or otherwise, as the result of good faith bargaining.

Will you please sign one copy of this letter acknowledging your agreement with this understanding and return it to me.

Sincerely,

HOLYOKE WATER POWER COMPANY

Donald E. Riga
Manager of Personnel

Approved:

Business Manager, IBEW Local #455

77

174 Brush Hill Avenue
West Springfield, Mass. 01089
July 20, 1976

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local #455
145 State Street, Room 416
Springfield, Mass. 01103

Dear Mr. Collins:

In reference to the letter of understanding between the parties dated July 19, 1976, with respect to the Appliance Purchase Program and the pending Unfair Labor Practice Case on the same subject, the Company and the Union agree that the manner of disposition of the matter in the Western Mass. Electric Company case, either by compliance or as a result of litigation, will be applied to the Holyoke Water Power Company.

It was further agreed that the period of dispute settlement will be the same for the Holyoke Water Power Company as the Western Mass. Electric Company, ten months.

In consideration of the above, the pending Unfair Labor Practice Case on this subject currently before the NLRB will be withdrawn.

Sincerely,

Donald E. Riga
Manager of Personnel

Approved:

_____
Business Manager, IBEW Local #455

78

---

July 1, 1976

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local #455
145 State Street, Room 416
Springfield, Mass. 01103

Dear Mr. Collins:

This is to confirm our understanding on the following matters discussed during our negotiations meetings in connection with a new Agreement effective July 1, 1976.

1. The Company will supply overtime summaries to the Business Manager and Assistant Business Manager monthly.

2. The Company will supply coveralls to Generating Station employees who are normally involved in changing and cleaning oil guns and oil strainers.

3. In accordance with the administration of the Holyoke Water Power Company's policy of granting four hours of with pay prior to the Christmas holiday, should the Company not allow such time off to an employee, such an employee shall be granted four hours' straight-time pay in lieu of such time off.

4. The Company agrees to supply the Union with four (4) bulletin boards.

5. The Company will provide printed agreements in book form.

6. The Company will provide a $25.00 safety shoe allowance. The employee must furnish a receipt of purchase and the allowance will be limited to one purchase per calendar year. (See 10/01/01 addendum to Safety Shoe Allowance)

7. Improvements to Health Insurance Plan.

Very truly yours,
Donald E. Riga
Regional Personnel Manager

DER:v

79

## 10/01/01 Safety Shoe Allowance:

The Company will provide up to $150.00 allowance to Employees towards the purchase of safety footwear (one pair) that meets the requirements for impact/compression resistance and protection from electrical hazards. (EH rated) as described in Sections 1 and 4 of ANSI Standards Z41-1999.

The Employee must furnish a receipt of purchase for reimbursement documenting the purchase of safety shoes which meet the above safety standard and the allowance will be limited to one purchase per year. Ordering safety shoes through the Company stock rooms has been discontinued.

80

---

August 1, 1982

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local 455
655 Page Boulevard, Room 213
Springfield, Mass. 01104

Dear Mr. Collins:

The following understandings were reached during the 1982 contract negotiations:

1. **License Premiums**

   All employees hired on or after 7-1-83 will not be eligible for license differential premium payments. Effective 7-1-83 all such license payments to employees will be frozen at existing levels with the exception of Steam Operating employees who obtain Mass. Fireman's and Engineer's licenses above the level required by their job classification.

2. **Asbestos**

   The Company agrees that during major overhauls it will endeavor to perform any required work on asbestos with a small crew prior to the start of the job.

3. **COPE**

   The Company will provide for payroll deduction for COPE as required by law.

Sincerely,
HOLYOKE WATER POWER COMPANY

Donald E. Riga
Regional Personnel Manager

Approved:

Business Manager, IBEW Local 455

81

July 30, 1984

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local 455
655 Page Boulevard, Room 213
Springfield, MA 01104

Dear Mr. Collins:

The following understandings were reached during the 1984 contract negotiations:

1. **Overtime Records**

Overtime records are to be posted weekly.

2. **WMECO Job Postings**

All WMECO bargaining unit job postings will be posted at Holyoke Water Power Company.

3. **Medical Monitoring**

The Union to receive, upon request, reports of all medical monitoring of bargaining unit employees in anonymous form.

Upon request by a bargaining unit employee and/or the Union and provided that individual employee authorizations are submitted when required, the Company shall provide such safety and health information as is available.

4. **CL&P Logo**

The Company will print on the back cover of the contract booklet a logo similar to that used by CL&P.

Sincerely,

Donald E. Riga
Regional Personnel Manager

DER/kss

82

---

September 28, 1984

Operator's Assistant

Mr. Edward W. Collins, Jr.
Business Manager, IBEW Local 455
655 Page Boulevard, Room 213
Springfield, MA 01104

Dear Mr. Collins:

The following understanding was reached during the 1984 contract negotiations:

Operator's Assistant will perform at Hadley and Boatlock Stations all duties performed by them at Skinner, Chemical, and Beebe Holbrook with the following exception:

If the automated start-up procedure does not function properly the Operator's Assistant is instructed to call the Shift Supervisor on duty.

In addition, it is understood that switching is not a part of the duties of an Operator's Assistant, however, this is no way limits management's rights to assign work and determine job context as outlined in Article 5.

Sincerely,

Donald E. Riga
Regional Personnel Manager

DER/etp

83

July 1, 1986

Mr. Edward W. Collins, Jr.
Business Manager/Financial Secretary
International Brotherhood of Electrical Workers
Local 455
655 Page Boulevard, Room 213
Springfield, MA 01104

Dear Mr. Collins:

The Company and the Union have agreed that upon receipt of a request from any bargaining unit employee, the Company will arrange for the sampling and testing of any substance or material which employees may be exposed to in the course of their employment that may have the potential for causing adverse health effects.

The Union will ensure that all requests are reasonable and germane to the employees work environment.

The Company will, as soon as practicable, (not later than four weeks following sampling) make available to the requester and the Union the results of the analysis.

If there is a question regarding the results or if the results are not transmitted in a timely manner to the employee and the Union, then the Union shall have the right to request and receive a sample from the Company of any such substance or material for independent analysis. A copy of the results of the Union analysis shall be promptly transmitted to the Company.

Sincerely,
Vincent F. Villano
Regional Personnel Manager

Approved:

Edward W. Collins, Jr.
Business Manager, IBEW Local 455

84

---

July 1, 1986                                                                 1

Mr. Edward W. Collins, Jr.
Business Manager/Financial Secretary
International Brotherhood of Electrical Workers
Local 455
655 Page Boulevard, Room 213
Springfield, MA 01104

Dear Mr. Collins:

The following items have been agreed to during the 1986 Contract negotiations:

**Time Merit Progression (TMP)**

Establish TMP programs for Maintenance Electricians and Mechanics in the Fossil and Hydro facilities by October 1, 1986.

Establish TMP program for Lineman by November 1, 1986.

**Hydro Maintenance Mechanic - Riverside**

Following the implementation of a Hydro Mechanic TMP program, delete classification "Construction and Maintenance Crew Worker" and transfer incumbents to the first rate step in the classification "Hydro Maintenance Mechanic - Riverside." Transferees will enter the TMP program at an appropriate point for progression to maximum rate.

Sincerely,

Vincent F. Villano
Regional Personnel Manager

85

July 1, 1986

Mr. Edward W. Collins, Jr.
Business Manager/Financial Secretary
International Brotherhood of Electrical Workers
Local 455
655 Page Boulevard, Room 213
Springfield, MA 01104

Dear Mr. Collins:

**Subject:  Paid Time Off for Massachusetts State
License Exam for Engineers and Firemen**

The Company agrees to the following paid time off:

11:00 p.m. to 7:00 a.m. shift - immediately preceding exam

7:00 a.m. to 3:00 p.m. shift - day of exam

3:00 p.m. to 11:00 p.m. shift - on day of exam the Employee will be expected to return to work at completion of exam.

Sincerely,

Vincent F. Villano
Regional Personnel Manager

86

---

July 10, 1986

Mr. Edward W. Collins, Jr.
Business Manager/Financial Secretary
International Brotherhood of Electrical Workers
Local 455
655 Page Boulevard, Room 213
Springfield, MA 01104

Dear Mr. Collins:

**SUBJECT: Cross Rostering**

The following has been agreed to during the 1986 contract negotiations:

The Company has the right to assign Employees between Holyoke Water Power Company and Western Mass. Electric Company during regular work hours. The Company will assure that qualified available Employees normally located at the work site are the first to be offered the assignment. Absent an IMF agreement with Holyoke Water Power Company, the Company will not assign Holyoke Water Power Employees to Western Mass. Electric Company for the purposes of IMF assignments nor will any HWPCO Employees be required to accept an assignment outside of the Western Mass. region of Northeast Utilities.

Once a cross rostering assignment has been made and unscheduled overtime of two and one-half (2½) hours or less is needed to complete the days work assignment, those cross rostered Employees assigned may be offered the overtime assignment.

Scheduled overtime, under cross rostering, will be assigned to the available qualified Employee under the Contract that the work site is covered by.

Overtime (call-outs) will be assigned to Employees whose Contract governs that work site.

87

This language is not intended to add or subtract from the existing practices where Employees of Connecticut Light and Power Company work in the Holyoke Water Power territory or the practices now in existence where Holyoke Water Power Company Employees work in the Connecticut Light and Power territory. Travel and time will be paid at applicable rates.

Sincerely,

Vincent F. Villano
Regional Personnel Manager

Approved:

Business Manager, IBEW Local 455

88

August 2, 1989

Mr. William O'Rourke
Business Manager
I.B.E.W., Local 455
655 Page Blvd., Room 213
Springfield, MA 01104

SUBJECT: Access

Dear Mr. O'Rourke:

The Company and the Union agree the procedures listed below will be followed to address the situation of a Union-selected, qualified industrial hygienist having access to Holyoke Water Power Company facilities:

1. Prior to making a request for such access, the Union will exhaust all other reasonable alternatives to obtain the industrial hygiene information including the right of the Company to perform or conduct such test or surveys requested by the Union and thereafter to provide the test or survey results to the Union. The Company will endeavor to provide such relevant test data to the Union within four weeks of the test or survey insofar as is practical.

2. If requested by the Company, the Union will meet with the Company to discuss the relevancy of the information sought and the necessity of access. It is the Company's position that the Union has the burden to investigate reasonable alternatives to access by a hygienist before requesting such access.

89

3. If the reasonable alternatives are not able to produce the information or resolve the Union's questions, a Union-selected, qualified industrial hygienist shall be granted access to the test area or location where there remains a question. A mutually agreed time and date will be established in a timely manner. It is understood that whenever access is granted it shall be for a specific and reasonable period and shall not interfere with Company operations. The Union will make available to the Company the results of the analysis within four weeks of the test or survey insofar as practical.

4. The Company shall have the right to accompany the Union's representatives which shall not exceed three in number including one qualified industrial hygienist.

Very truly yours,

Paul W. Barr
Regional Personnel Manager
PWB:cc

90

---

August 2, 1989

Mr. William O'Rourke
Business Manager
I.B.E.W., Local #455
655 Page Blvd., Room 213
Springfield, MA 01104

SUBJECT: Long-Term Care

Dear Mr. O'Rourke:

At the 1989 negotiations, the following item concerning Long-Term Care was agreed upon by the Company and the Union.

Effective January 1, 1990, the Company will implement coverage for Long-Term Care. Plan provisions include:

Eligibility: Active bargaining unit employees eligible for coverage under the terms of this Agreement.

Benefit: Long-term care is an insurance coverage that provides for out-of-pocket expenses not covered under traditional health insurance plans for illnesses or disabilities that tend to require custodial, long-term care.

Costs: The employee will have payroll deductions to cover the premium for this insurance. Employees will pay the full premium for this insurance. The Company will not be making any contribution towards this coverage. However, Northeast will assume administrative costs for this Plan and provide the advantage and availability of this insurance through group coverage.

91

Conversion Option:

The Plan will have an option to convert to individual coverage with the carrier. In addition, depending upon the participant's age when entering the Plan and length of participation, the coverage may be paid up at retirement.

Note: The selection of carrier and all details of coverage are not yet finalized. Until the final selection takes place, full details cannot be provided.

Very truly yours,

Paul W. Barr
Regional Personnel Manager
PWB:cc

92

---

August 2, 1989

Mr. William O'Rourke
Business Manager
I.B.E.W., Local #455
655 Page Blvd., Room 213
Springfield, MA 01104

SUBJECT: Child Care Referral Services

Dear Mr. O'Rourke:

At the 1989 negotiations, the following items concerning Child Care Referral Services were agreed upon by the Company and the Union.

Effective January 1, 1990, the Company will make available a Child Care Referral Service.

1. Individual Employee Consultation

Individual phone consultations with employees with child care needs will be offered to assist them in identifying the most appropriate type of child care provider. The consultant will be a staff member of the Pre-School Enrichment Team (PET) based in Holyoke.

2. Data Base of Child Care Providers

Access to a data base of approximately 900 state regulated child care providers throughout Western Massachusetts.

3. Provider Referrals

Information that identifies several potential child care providers within a specific geographic area. This information is provided to employees to facilitate the selection of an appropriate provider. PET, NU/HWPCO, and I.B.E.W. Local #455 do not recommend a provider. The employee is responsible for the ultimate selection of a child care provider.

Very truly yours,
Paul W. Barr
Regional Personnel Manager

Rev: 10/01/01: Provider is now Work/Life Innovations "Generations Program) 800-568-7436

93

August 2, 1989

Mr. William O'Rourke
Business Manager
I.B.E.W., Local #455
655 Page Blvd., Room 213
Springfield, MA 01104

SUBJECT: Dependent Day Care

Dear Mr. O'Rourke:

At the 1989 negotiations, the following item concerning Dependent Day Care was agreed upon by the Company and the Union.

Add Dependent Day Care Reimbursement Account effective January 1, 1990.

During the year, the selected amount of money will be deducted before taxes from paychecks (not to exceed the current maximum deduction permitted by IRS regulations and statutes). Expenses must be incurred during the year in which the contributions are made to be eligible for reimbursement. Claims must be submitted by June 30 of the next year to be eligible for reimbursement. Otherwise the dollars will be forfeited and put in a pool. Employees who forfeit money after June 30 and enroll in a new Dependent Day Care account in the subsequent year will have an equal portion of the pooled money credited to that account. Reimbursements are subject to IRS regulations concerning eligibility of providers and dependents.

Very truly yours,

Paul W. Barr
Regional Personnel Manager

PWB:cc

**Rev: 10/01/01 - Per IRS rules, any monies not used will be forfeited. You cannot receive a refund, carry balances over to pay for the next year's expenses, or transfer money from your Health Care Account to your Dependent Care account or vice versa. All monies left in your account beyond June 30 will be forfeited to the plan and used to offset plan administrative costs.**

94

---

June 30, 1995
LR-95-471

Mr. William H. O'Rourke
Business Manager/Financial Secretary
I.B.E.W., Local 455
1355 Liberty Street, Suite 210
Springfield, Massachusetts 01104

Dear Mr. O'Rourke:

It has been agreed that the Assistant Business Manager at Holyoke Water Power Company will be paid for third step grievance meetings effective October 1, 1994 through October 1, 1998.

This agreement expires October 1, 1998.

Very truly yours,

Paul W. Barr
Manager-Labor Relations

PWB/jlk

95

June 30, 1995
LR-95-470

Mr. William H. O'Rourke
Business Manager/Financial Secretary
I.B.E.W., Local 455
1355 Liberty Street, Suite 210
Springfield, Massachusetts 01104

Dear Mr. O'Rourke:

In the event that the Company has made a determination to transfer or sell all or a portion of its facilities and operations to a successor employer, and said sale or transfer will have an impact on bargaining unit positions, the Company agrees to meet with the Union for the purpose of bargaining over the impact of said sale or transfer on bargaining unit employees. The Company will meet with the Union for the purpose of said bargaining at least six (6) months in advance of the effective date of said sale or transfer, unless prevented from doing so for reasons beyond the Company's control. This paragraph is not intended to cover the sale or transfer of equipment or property in the normal course of business.

Very truly yours,

HOLYOKE WATER POWER COMPANY

Paul W. Barr
Manager-Labor Relations

PWB/jtk

96

---

November 8, 2001

Mr. William H. O'Rourke
Business Manager/Financial Secretary
I.B.E.W., Local 455
57 Observer Street
Springfield, MA 01104

Subject: License Premiums

Dear Mr. O'Rourke:

At the October 1, 2001 Holyoke Water Power Company contract negotiations, the Company and the Union agreed to the following license premium adjustments:

- A one-time stipend payment of $500.00 will be paid for the attainment of each Massachusetts license grade above that which is required for the classification, up to and including 3rd Class Engineer's license; $1,000.00 for attaining a 2nd Class Engineer's license; and $1,500.00 for attaining a 1st Class Engineer's license.

The following license premium adders (added to the hourly base step rate) will apply for holders of "active" Massachusetts licenses in the following classifications:

- Relief Control Room Engineer with a Massachusetts 1st Class Engineer's license: $0.50

97

March 29, 2001

Mr. William H. O'Rourke
Business Manager/Financial Secretary
I.B.E.W., Local 455
57 Observer Street
Springfield, MA 01104

Subject: Letter of Understanding -
Mt. Tom 12-Hour Shift Schedule

Dear Mr. O'Rourke:

This letter is to confirm the agreement between the Company and Union regarding the twelve (12) hour shift schedule for the Operations Department at Mt. Tom Station. The twelve (12) hour shift will remain in effect, on a trial basis, beginning on Sunday, April 01, 2001 through the upcoming negotiations for the Collective Bargaining Agreement and may be canceled by either side with a two week notice.

The following conditions will apply to the twelve (12) hour shift schedule:

- The alternating twelve (12) hour shift schedules will be forty-four (44), thirty-six (36), forty-eight (48) and thirty-two (32) hours respectively in four week cycles with twelve (12) hours of overtime occurring during every four-week cycle. Overtime will only occur on those weeks which exceed forty (40) hours.

  12-Hour Day Shift -    7:00 a.m. - 7:00 p.m.
  12-Hour Night Shift -    7:00 p.m. - 7:00 a.m.

99

---

- Control Room Engineer with a Massachusetts 1st Class Engineer's license: $0.50

- Utility Operator with a Massachusetts 2nd Class Engineer's license: $0.50

Sincerely,

James G. Connolly
Sr. H.R. Consultant - Labor Relations

/cb
cc:   D. Brown
      C. Burrell
      R. Lizotte
      J. Murray

Agreed to by the Union:

_____    _____
William H. O'Rourke - Local 455              Date

98

8-Hour Relief Operator Schedule:

| | | |
|---|---|---|
| Day | - | 7:00 a.m. - 3:00 p.m. |
| Afternoon | - | 3:00 p.m. - 11:00 p.m. |
| Night | - | 11:00 p.m. - 7:00 a.m. |

Compensation for the twelve (12) hour shift schedule will be as follows:

- Holiday pay policy for holidays worked is defined as eight (8) hours of holiday pay (at straight time rates) plus total hours worked at one and one-half (1½) times the straight time rate.

- Sunday premium is paid for twelve (12) hours on a scheduled Sunday. Double time will be paid for all hours worked on a Sunday that was a normal scheduled day off. Time and one-half (1½) is paid for all other days worked that are a scheduled day off.

- Employees working twelve (12) hour shifts shall be paid a shift premium for only the twelve (12) hour night shift (7:00 p.m. - 7:00 a.m.). Employees working eight (8) hour shifts on relief days and spare schedules will continue with their current shift premiums.

- Vacations are accounted for in hours. For the purpose of split vacation weeks, each vacation week is defined as the equivalent of a Sunday to Saturday pay week. A core scheduled twelve (12) hour day taken as a vacation day is charged as twelve (12) hours of vacation.

- Sick time will be accounted for in hours.

- When a core schedule that contains more than forty (40) hours is worked, the additional hours worked over

100

40 will be paid at time and one-half. When a core schedule contains less than forty (40) hours, the actual hours worked (under 40) will be paid. Rest time will remain the same (i.e., if an employee reports to work four (4) hours early, that employee will be entitled to four (4) hours rest time).

- Meal allowances will not apply for regularly scheduled twelve (12) hour shifts including those shifts with built-in overtime. However, Operators "called-in" will be entitled to a meal according to the meal allowance policy (e.g., after each five (5) hour interval of work).

- The Relief Operators' work weeks will average 40 hours and they will be available for relief work when necessary. Normal days off for the Relief Operator will be Saturday and Sunday. When the Relief Operator is covering a twelve (12) hour shift, overtime for the Relief Operator will be subject to the same provisions of this Agreement as for the other Mt. Tom Operators (e.g., overtime after 40 hours).

An employee must perform actual work in excess of forty (40) hours per week in order to be paid at overtime rates, therefore, the following applies:

- When a core schedule contains less than forty (40) hours (e.g., 36 hours) additional hours up to forty (40) are paid at straight-time rates.

- When sickness occurs during a core schedule that contains over forty (40) hours, the sick benefits over forty (40) hours will not be paid at time and one-half.

- When absences occur due to vacation or sickness during a core schedule week that contains over forty

101

(40) hours, the hours over forty (40) will be paid at time and one-half only if the hours that were scheduled to be over forty (40) are actually worked. If a non-productive time code is applied to those hours that are over forty (40) hours in a given pay week, those hours will be paid at straight time.

If you are in agreement with the above outlined schedule, please sign below and return a copy to me.

Sincerely,

James G. Connolly
Sr. H.R. Consultant - Labor Relations

JGC/cc
cc:    C. Burrell
       E. Kaczenski
       J. Murray
       R. Pawloski

Agreed to by the Union:

_____    _____
William H. O'Rourke, Business Manager         Date
I.B.E.W., Local 455

102

---

November 19, 2001

Mr. William H. O'Rourke
Business Manager/Financial Secretary
I.B.E.W., Local 455
57 Observer Street
Springfield, MA 01104

Subject: Call-In - Relief Control Room Operators

Dear Mr. O'Rourke:

In accordance with the Company's letter of March 29, 2001 regarding Mt. Tom's 12-Hour Shift Schedule, the Company and the Union agree that Relief Operators who are called at home for schedule changes with less than fourteen (14) hours notice, will be paid at time and one-half (1½) at their regular straight-time pay until they have reached the fourteen (14) hour period.

Sincerely,

James G. Connolly
Sr. H.R. Consultant - Labor Relations

JGC/cb
cc:    D. Brown
       E. Kaczenski
       R. Lizotte
       J. Murray

Agreed to by the Union:


William H. O'Rourke, Local 455

Date: _____

103

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
*Hampden*

*Richard Scrugge*

**DEFENDANTS**
*Attorney James Hall*

*Midsex County*

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
*Pro See*

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☑ 1 | Incorporated or Principal Place of Business In This State | ☑ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☑ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
*Legal Malpractice*

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE

DOCKET NUMBER

DATE
*Richard M Scrugge*

SIGNATURE OF ATTORNEY OF RECORD
*8/11/05*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

*30b080*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)  *Richard Scruggs*

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    I.      160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

    II.     195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
           740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

    III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
           380, 385, 450, 891.

    IV.    220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
           690, 810, 861-865, 870, 871, 875, 900.

    V.     150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                  YES               NO

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                  YES               NO

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                  YES               NO

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                  YES               NO

7.  Do all of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                  YES               NO

    A.     If yes, in which division do all of the non-governmental parties reside?

           Eastern Division                 Central Division                 Western Division

    B.     If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

           Eastern Division                 Central Division                 Western Division

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                  YES               NO

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  *Pro Se*

ADDRESS _____

TELEPHONE NO. _____

(CategoryForm.wpd - 5/2/05)

MON 04:06 PM

107 Selden Street, Berlin, CT 06037

**Northeast Utilities System**

Northeast Utilities Service Company
P.O. Box 270
Hartford, CT 06141-0270
(203) 665-5000

*LEGAL DEPARTMENT*
*FACSIMILE REQUEST*

**TO:**  Steven Weiner, Esq.

**DATE:**  December 16, 2002

**FAX NUMBER:**  413-732-2946

**PHONE NUMBER:**

**NUMBER OF PAGES:**  32  (including Coversheet)

**FROM:**  Lisa Davenport

**PHONE NUMBER:**  860-665-3925  **FAX NUMBER:** 860-665-5504

**SECRETARY/EXT:**  Tammy N. Gagnon (860)665-3348

IMPORTANT NOTICE: The documents accompanying this telecopy transmission contain information which may be confidential or privileged. The information is intended for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this telecopied information is prohibited. If you have received this telecopy in error, please notify us by telephone immediately so that we may arrange for the retrieval of the original documents at no cost to you.

 **Northeast
Utilities System**

107 Selden Street, Berlin, CT 06037

Northeast Utilities Service Company
P.O. Box 270
Hartford, CT 06141-0270
(860) 665-3925
Fax (860) 665-5504
Email: davenub@nu.com

Alicia B. Davenport
Senior Counsel

**VIA FACSIMILE AND FEDERAL EXPRESS**
Facsimile No. 413-732-2946

December 16, 2002

Steven R. Weiner, Esq.
930 Main Street
Springfield, MA 01103

Re:   **Scruggs v. Holyoke Water Power Co.**

Dear Attorney Weiner:

Through inadvertence on my part, a copy of respondent's position statement was not
forwarded to you when it was filed with the MCAD. I am faxing a copy to you today and
sending a hard copy via Federal Express, to arrive tomorrow. I am also copying Mr. May
of the MCAD on this letter so that he is aware that you have received this material late.
Please contact me directly should you have any questions.

Sincerely,

Alicia B. Davenport

Enclosure

cc:   Mr. Gilbert May (w/o enclosure, via facsimile)
       Facsimile no. 413-784-1056

**Northeast**
**Utilities System**

107 Selden Street, Berlin, CT 06037

Northeast Utilities Service Company
P.O. Box 270
Hartford, CT 06141-0270
(860) 665-3925
Fax (860) 665-5504
Email: davennb@nu.com


Alicia B. Davenport
Senior Counsel

**VIA FEDERAL EXPRESS**

December 6, 2002

Mr. Gilbert May
Investigator
Commonwealth of Massachusetts
Commission Against Discrimination
436 Dwight Street
Springfield, MA 01103-2145

  Re: **Richard Scruggs v. Holyoke Water Power Company**
    **MCAD Docket No. 02SEM03181**
    **EEOC/HUD No. 16CA203255**

Dear Mr. May:

  The Respondent in the above matter submits this affirmed position statement in response to the allegations of the complaint in the above matter. Respondent is represented by counsel in this matter; Respondent's counsel is Alicia Davenport, Senior Counsel, Northeast Utilities Service Company, 107 Selden Street, Berlin, CT 06037.

  Initially, I wish to clarify that Complainant was not employed by the Holyoke Water Power Company at the time of his termination. His employer, from December 2001 until his termination, was Northeast Generation Services Company ("NGS" or "the Company"). Both Holyoke Water Power Company and NGS are subsidiaries of Northeast Utilities, a Massachusetts holding company, but they are separate corporations with separate functioning boards of directors, and the appropriate respondent in this matter is NGS.

  NGS unequivocally denies that Complainant was wrongfully terminated or discriminated against based on his race or color. This complaint should be dismissed because Complainant has offered no facts whatsoever that support his claim of

Mr. Gilbert May
Investigator
December 6, 2002
Page 2 of 7

discrimination. The Company had a legitimate, nondiscriminatory reason for terminating his employment, which Complainant has not disputed and cannot dispute.

1. **Background and Facts**

Complainant was hired June 28, 1978, as a Yard Man and Utility Man at Mt. Tom Station, a power plant owned by the Holyoke Water Power Company. He progressed through various positions at the plant until 1996, when he became an Area Stockhandler. In that position, Complainant was responsible for receiving and storing materials used at the plant, purchasing and collecting supplies, and maintaining a materials inventory, as well as overseeing the accounts payable records, invoicing, inputting material that was distributed, and overseeing the storeroom.

As a result of restructuring in the electrical industry, Complainant and other employees at the Mt. Tom Station became employees of Northeast Utilities Service Company in April 2000. Then, in December 2001, the employees at Mt. Tom Station, including Complainant, became employed by Northeast Generation Services Company. NGS provides management and operating services to the Company that owns Mt. Tom Station, Holyoke Water Power Company.

NGS utilizes several trucks in its operations at the Mt. Tom Station power plant. In order to keep these vehicles fueled, the Company provides special credit cards ("WEX" cards), which are left in the trucks' glove compartments or visors to be used when it is necessary to refuel them. The credit cards can be used at any retail gas station that accepts credit cards. In the event that a company vehicle is unavailable when an employee must travel for work, employees utilize their own personal vehicles and are reimbursed for mileage by HWP; they are not, however, permitted to use the Wright Express card to purchase gas in their personal vehicles.

At the end of every month, Wright Express, the company that issues the WEX Cards, provides the company with a report, detailing, among other things, the location and grade of fuel that has been purchased on the card during the prior month. In the Fall of 2001, NGS management noticed that premium unleaded fuel was being charged on the WEX cards at Mt. Tom Station. Since the Company policy is to use only regular grade unleaded gasoline in Company vehicles, the Company took steps to stop the purchase of premium fuel. Assuming that the premium unleaded fuel was purchased as a mistake, Company management issued a memo to all employees on December 11, 2001, reminding them that "when refueling our Company vehicles, ... we should only be using regular unleaded fuel" and that "at the time of refueling, we all need to record the odometer reading accurately" (emphasis in original). Over the next few months, Company management again noticed that premium unleaded fuel had been charged on the WEX card. Consequently, the company again issued the same memo to all employees on March 6, 2002.

Mr. Gilbert May
Investigator
December 6, 2002
Page 3 of 7

Also at this time, William Nadeau, Vice President and Chief Operating Officer of NGS, requested that John Murray, Station Manager at Mt. Tom Station, explain what steps he was taking in an effort "to stop this misuse" and determine "whether we need to bring in the security department . . . ." Murray reviewed more closely the monthly reports sent by Wright Express. He noted that many of the improper purchases occurred on Mondays and Fridays, generally around lunch time. He also noted that many of the amounts were well below the tank capacity of the company vehicles. In addition, on many occasions, premium unleaded gasoline had been charged to the card that was assigned to and located in a diesel truck. Murray then contacted Wright Express and requested a summary of all fuel purchases between September 2001 and March 2002.

Murray also decided it would be prudent to involve the security department of the Northeast Utilities system for further assistance with the investigation. Murray contacted Scott McKenzie, Manager of System Security, who decided that setting up a surveillance operation would be the best manner in which to identify whether a Mt. Tom Station employee was using the WEX card improperly. Although no specific employees had been identified as likely suspects, Murray did relay to McKenzie that the two stockhandlers in the warehouse would have the best opportunity to leave the station in the middle of the day without being observed because the warehouse was located directly adjacent to the station gate, which is quite a distance from the actual plant.

Many of the Wright Express reports indicated that premium unleaded fuel had been purchased at the Northern Mobil Station on Route 5 in Northampton. Thus, McKenzie established the first surveillance on Route 5, which runs directly past Mt. Tom Station. The surveillance consisted of one individual watching the entrance to the Mt. Tom Station access road, while the other was positioned at the Mobil Station with a video camera. When the first individual observed a Mt. Tom employee leaving the station during the work day, heading north on Route 5, he would use a cellular phone to call the second individual to describe the vehicle in question. If that vehicle entered the Mobil Station, the second individual would begin videotaping the scene.

On March 18, 2002, McKenzie, who had the job of observing whether employees left the station, noticed a black GMC Jimmy leave the plant at 11:45 a.m., heading north on Route 5. McKenzie phoned Ray Cramer, who was stationed at the Mobil Station to alert him that a vehicle had left the station. Cramer watched as the vehicle pulled into the Mobil Station. Cramer then repositioned his own car in order to have a clearer shot while videotaping the Jimmy. Cramer observed and videotaped an individual pump gas into the Jimmy.

One week later, on March 25, 2002, Cramer, who was observing the employees enter and exit Mt. Tom Station, watched as a Lincoln Mark VII left the station at approximately 11:30 a.m., heading north on Route 5. Cramer then phoned McKenzie,

Mr. Gilbert May
Investigator
December 6, 2002
Page 4 of 7

who was positioned at the Mobil Station and described the vehicle to him. As the Mark VII pulled into the station, McKenzie began videotaping. The driver parked the car in front of a pump, approached the pump with a credit card, turned away from the pump, and drove away without ever having pumped any gas. He drove north on Route 5 and McKenzie followed him to a Shell Station located in Northampton. McKenzie positioned himself so that he would be able to videotape the vehicle. The Mark VII was parked in front of a pump; however, McKenzie was unable to see the individual who was driving the vehicle. After the vehicle left the station, McKenzie went to the pump in front of which the Mark VII was parked, and videotaped the pump display, which showed that 13.2 gallons of gas had been pumped, at a cost totaling $18.77.

Murray reviewed the surveillance video and identified the driver of both the GMC Jimmy and the Lincoln Mark VII as the Complainant, Richard Scruggs. Murray then obtained monthly summaries from Wright Express detailing the activity on the cards on the dates of the surveillance. The reports confirmed that on March 18 at 11:48 a.m., the card was used to purchase fuel at Northern Mobil and that on March 25 at 11:31 a.m., the card was used to purchase fuel at the Shell Station in Northampton in the exact same amount as shown in the videotape.

Based on this information, the Security Department concluded that Complainant had used the company card to purchase fuel for his personal vehicles, thereby committing theft of Company resources. *See* Security Department Investigation Summary, attached at Tab 1. Murray and NGS management, in consultation with Human Resources, determined that the proper course of action would be to discharge Complainant for misconduct. On April 12, 2002, Complainant was terminated for "unauthorized use of Company fuel credit card for personal use."

## II.    Argument

### A.    Complainant Has Failed to State a Claim Upon Which Relief Can Be Granted, as He Has Not Named a Valid Respondent.

Complainant has named the Holyoke Water Power Company ("HWP") as Respondent in this matter. However, Complainant was employed by NGS at the time of his termination, and had been so employed since December 2001. Prior to December 2001, Complainant was employed by the Northeast Utilities Service Company, which had become his employer in April 2000. John Murray, whom Complainant alleges discriminated against him, also is an employee of NGS. Thus, Complainant has not alleged a valid respondent in this matter, as the named Respondent was not Complainant's employer and had nothing to do with Complainant's termination. *See* M.G.L. c 151B § 4; 42 U.S.C. § 2000e-2(a) (prohibiting discrimination on the basis of race or color by "an employer").